DAVID GRAHAM LAPHEW

*v.*

CONSOLIDATED BUS LINES, INC., *et al.*

(No. 10156)

Submitted September 13, 1949. Decided October 18, 1949.

292

Lovins, Judge, not participating. Fox, Judge, dissenting.

*W. H. Ballard, S. H. Ballard,* for plaintiff in error.

*B. F. Howard,* for defendants in error.

Riley, Judge:

In this action of trespass on the case, brought in the Circuit Court of McDowell County by David Graham Laphew against Consolidated Bus Lines, Inc., and Fred Murphy, its employee-bus operator, to recover damages for injuries sustained by plaintiff while riding as a passenger for hire on the bus of defendant bus company, operated by the defendant, Fred Murphy, from Welch, West Virginia, where plaintiff boarded the bus, to Coalwood, West Virginia, plaintiff's destination. Plaintiff prosecutes this writ of error to an order of the said circuit court setting aside a jury verdict in plaintiff's favor in

the amount of five thousand dollars, and awarding a new trial to defendants.

For convenience, David Graham Laphew will be referred to herein as "plaintiff"; Consolidated Bus Lines, Inc., as the "bus company"; and Fred Murphy as the "defendant's employee" or the "bus driver."

The declaration alleges that the bus company, at the time of the alleged injuries, was a common carrier of passengers for hire and reward by motor vehicles, commonly referred to as busses, from Welch, in McDowell County, over, along and upon United States Highway No. 52, in a southerly direction to Coalwood in the same county; that the defendant's employee was the servant, agent and employee of the bus company, engaged in operating the bus upon which plaintiff was injured; that plaintiff at the time he was injured was a passenger for hire on a bus travelling from Welch to his home in Coalwood; that it was the duty of the bus company and its employee to operate, and cause to be operated, the bus with due care and caution, so that plaintiff could be safely carried by the bus to his destination; that notwithstanding such duty, the defendants negligently and carelessly "suffered" the side of the bus on which plaintiff was then and there riding as a passenger to come in violent contact with an electric power pole erected on the west side of the road as the bus travelled in a southerly direction along United States Highway No. 52, within the City of Welch; and that as a result thereof plaintiff was severely, painfully, and permanently injured, suffered mental pain and anguish, and was required to expend, and did expend, a large sum of money in and about his endeavor to be healed of said injuries.

In support of their position that the trial court properly set aside the jury verdict, the defendants say: (1) There is no evidence of negligence on the part of defendant's employee, the bus driver; (2) that the proximate cause of the plaintiff's injuries was the negligence of the driver of an automobile approaching the bus company's bus in an opposite direction, partly on the wrong side of the street,

which crowded the bus to the westerly curb, causing it to come in contact with a pole of the power company negligently installed inside the curb of the western pavement of the street, in such manner as to encroach upon the paved portion of the street and to obstruct the free passage of vehicular traffic·thereon; and (3) that the physical facts conclusively show that plaintiff was seated in the bus with his arm protruding from the window, when the bus grazed the pole, and, therefore, plaintiff is precluded from recovery on the theory that he was guilty of contributory negligence.

In view of the trial court's action in setting aside the jury verdict in plaintiff's favor, we are necessarily guided by the same rule which governs the appraisal of a directed verdict, where, as here, in the essential particulars, the evidence of the plaintiff and of the defendant conflicts. In *Adkins* v. *Raleigh Transit Co.*, 127 W. Va. 131, 135, 31 S.E. 2d 775, this Court held: "In view of the jury's resolving this conflict in plaintiff's favor, we must, in the appraisal of this case, as every trial court should do in the consideration of a motion for a directed verdict [or a motion to set aside a verdict], entertain every reasonable and legitimate inference favorable to the plaintiff fairly arising from the evidence, considered as a whole, and assume as true those facts which the jury may properly find under the evidence." To the same effect see *Hambrick v. Spalding,* 116 W. Va. 235, 179 S. E. 807; *Fielder, Admx.* v. *Service Cab Co.*, 122 W. Va. 522, 11 S. E. 2d 115; *Boyce* v. *Black,* 123 W. Va. 234, 15 S. E. 2d 588; *Wilson* v. *Co-operative Transit Co.*, 126 W. Va. 943, 945, 30 S. E. 2d 749.

Guided by this rule, we are at liberty to state the facts in the following manner:

On Saturday night, September 13, 1947, about eleven o'clock, plaintiff boarded the company's bus No. 150, as a passenger for hire at Welch for transportation to his home in Coalwood. At the time plaintiff was injured, he was seated in the second seat from the rear in the individual part of a double seat next to a window on the right side of the bus. The window was composed of two parts, a

stationary part in the rear, and a sliding part which, when fully opened, left a space of ten to twelve inches wide. Plaintiff testified, without substantial contradiction, that the window beside him had been pulled back about half way to the stationary part; that at the time he was injured the part of his arm from his shoulder to his elbow was resting on the window sill along the stationary part of the window, his right hand was resting on top of a box containing a topcoat, recently purchased, which brought his hand substantially on a level with the rest of his right arm.

The bus, as it was leaving Welch and was being driven in a southerly direction along Riverside Drive in that town, toward Coalwood along United States Highway No. 52, was greatly overcrowded. Though there were seats for only twenty-nine passengers, forty-five to fifty, or possibly more, passengers were being carried at that time. All of the seats were occupied, in at least one of the seats three passengers were seated, and the aisle was crowded from the front of the bus to a considerable distance in the rear. Four passengers were standing on the right of the driver, and one passenger, evidently due to the crowded condition of the bus, stood on the steps leading into the bus. The bus weighed thirteen thousand pounds, and, as most of the passengers were adults, if each passenger weighed an average of one hundred fifty pounds, the live bus-load would be seven thousand five hundred pounds, that is to say, that, as the bus proceeded along toward the place of the accident, it weighed, together with its passengers, twenty thousand five hundred pounds.

Shortly after the bus left the station in Welch, all the lights inside were turned off. It was travelling a short distance from the station along Riverside Drive in Welch at a speed variously estimated at fifteen to twenty miles an hour, and to the right of the center of the street, when it suddenly, without any warning, turned sharply to the right, evidently, as defendants claim, to avoid a collision with an oncoming automobile. Two of defendants' witnesses admit that the bus was suddenly turned to the

right, and there is substantial evidence in this record to the effect that the sudden turning of the bus caused it, in its loaded condition, to sway or swerve at its rear end to the left, and then rebound to the right, where the right side of the bus hit the power pole, which was located seven and one-half inches from the outside of the curb to the right of the bus and leaned at an angle of two degrees and sixteen minutes toward the curb and street.

The bus driver admitted that he had travelled the highway many times, and knew that the pole leaned toward the street. There is evidence to the effect that the rear vision mirror at the right of the bus was struck. Marks on the bus, as shown by an indentation on a small drainpipe running along the side of the bus over the windows, indicate that the bus came in contact with the pole for at least a distance of twelve feet along where plaintiff was sitting. The first contact, as shown by the indented condition of the drainpipe, began about six feet in front of the place where plaintiff was seated and continued to the rear thereof. In addition to the indentation on the drainpipe, blue paint marks were seen on the pole, which witnesses testified looked fresh and were of the same color as the bus. The bus driver testified that an examination of the bus disclosed to him that the second window from the back of the bus, that is the window at which plaintiff was sitting, was "crushed inward and back"; that the front panel was bent past the stationary or rear panel; and that the stationary panel "was crushed backward slightly and the glass in both were shattered."

Plaintiff testified, and he is corroborated by plaintiff's witness, Ray Moore, who was seated in the individual seat next to plaintiff, that he and Moore were seated leaning back in their individual seats, when the bus swerved and struck the pole. Both these witnesses testified that due to the sudden application of the brakes, and the swerving of the bus, they were pitched forward. Moore testified that in order to protect himself, he braced himself by holding to the seat in front of him. Plaintiff testified that he likewise was pitched forward and to the right, so that his arm

was thrown from its resting place, and his face in some manner was struck, causing injuries which, he testified and the record discloses, were severe. Moore did not notice the position of plaintiff's right arm, but plaintiff's witness, E. E. Cassell, who was standing in the aisle about six feet from plaintiff, facing the right of the bus, saw, with no person or thing obstructing his view, plaintiff's arm resting on the window sill about five seconds before the bus suddenly swerved, causing witness to lose his balance; but this witness was unable to say whether plaintiff's right hand was on the suit box, or whether plaintiff's arm changed position during the intervening five seconds.

Witnesses for both plaintiff and defendants testified variously as to the speed of the oncoming car. Defendant Murphy testified that the automobile was between two other cars travelling in the same direction, and was travelling at the time he first saw it across the center of the street at a speed of not more than thirty miles an hour. Other witnesses estimated the speed of the oncoming car from about the same speed at which the bus was travelling to a maximum of forty-five miles an hour. Murphy testified that when he first saw the car coming toward him on the wrong side of the street, the bus was about twenty to thirty feet from the pole; and on cross-examination he testified, rather reluctantly, to the effect that the oncoming car was thirty to thirty-five feet away when he first observed it. In view of this testimony it seems important to note that it conflicts with the testimony of defendants' witness, Vergil Stokes, who, at the time plaintiff was injured, was seated on the left side of the bus in the fourth seat from the rear of the bus. This witness testified that from the position of the bus at the pole, he could see up the street for a distance of about fifty yards, or one hundred and fifty feet; and that he saw the oncoming car that distance away. If this latter testimony is true, and the defendant Murphy, as he testified, first saw the oncoming car when he was twenty to thirty feet away from the pole, he could have seen the car, if he had looked when the witness Stokes says he looked as the bus

reached the pole, when the car was more than one hundred and seventy feet away from the pole.

A number of exhibits were filed, among which is defendants' Exhibit No. 2, which is a photograph taken a short distance north of the pole and between a curve in the street to the north of the pole and the pole. The camera used in this photograph was directed along the road toward Gary, which is the direction in which the bus was travelling at the time plaintiff was injured, and shows the slightly leaning power pole and for a distance of many feet, the exact number of which it is impossible to estimate from the photograph, up the road where the photograph shows an oncoming automobile, which has apparently just come into view. This photograph seems to corroborate the testimony of defendants' witness, Vergil Stokes, that he could see, and did see, the oncoming car one hundred and fifty feet away from the pole.

The width of the street opposite the pole from curb to curb was 19.7 feet. The bus had a width of seven feet and eleven inches, and the power pole was seven and one-half inches from the outside of the curb. Defendants' witness, L. H. Hornby, a civil engineer, testified that because the pole is inclined toward the street and the crown of the road will tilt the bus toward the pole, if the pole struck the top of the bus along where the drainpipe runs over the windows, the part of the bus below the windows would not touch the pole. However, this witness testified that if the pole were strictly vertical, it would touch the body of the bus and the drainpipe, too. A short distance north of the pole, estimated by Murphy as being thirty feet from the pole, there is the end of a curve which Murphy designates as "sharp," so if Murphy's testimony in this regard is true, the bus, as it proceeded along Riverside Drive must have emerged from this curve and proceeded on its way toward the place in the street opposite the location of the pole.

Let us consider at this time whether there is sufficient evidence in this record on the question of primary negligence to permit jury determination. In the consideration

of this question, we are, of course, guided by the cardinal rule set forth in *Isabella* v. *West Virginia Transportation Co.*, 132 W. Va. 85, 51 S. E. 2d 318; *Adkins* v. *Raleigh Transit Company*, 127 W. Va. 131, 134, 31 S. E. 2d 775; *Bennett* v. *Bartlett*, 110 W. Va. 478, 158 S. E. 712; and *Venable* v. *Gulf Taxi Line*, 105 W. Va. 156, pt. 4 syl., 141 S. E. 622, that where the relation of common carrier and passenger exists, the carrier owes to the passenger the duty to use the highest degree of care compatible with the practical operation of the vehicle. The *Isabella* case, while not departing from the general rule that negligence is never presumed in an action to recover damages for personal injuries or wrongful death but must be proved, held that "a *prima facie* case of negligence on the part of defendant arises when it is shown that plaintiff was injured while passively riding as a passenger in defendant's vehicle, operated as a common carrier of passengers." *Isabella* v. *West Virginia Transportation Co.*, *supra*, pt. 2 syl. But a *prima facie* case, of course, does not always stand up when evidence tending to rebut is introduced, and when substantial and credible evidence is introduced, which explains or overcomes the presumption of negligence, the rebuttable presumption no longer serves its purpose to permit of itself a plaintiff in a carrier and passenger case to recover. In *Jenkins* v. *Spitler*, 120 W. Va. 514, 517, 199 S. E. 368, this Court said that a "rebuttable presumption 'is not evidence of a fact, but purely a conclusion, having no probative force and designed only to sustain the burden of proof until evidence is introduced tending to overcome it.' 1 Jones, Commentaries, (2d ed.), 59, Section 30. * * * It does not shift the burden of proof. With the introduction of evidence, it loses entirely its legal force. Only the facts which give rise to it remain to be considered by the jury, along with the other evidence."

The fact that plaintiff in the instant case was injured while he was riding passively as a passenger in a motor bus, which was then being operated as a common carrier of passengers, gave rise to a *prima facie* case which, on

the question of negligence, is tantamount to a rebuttable presumption that the injuries were incurred as the result of defendants' negligence. But the defendants by evidence and in argument seek to explain or overcome this presumption of negligence on the basis that, as asserted by defendants, the oncoming automobile approaching in the opposite direction from that in which the bus was travelling, probably on the wrong side of the road, created an emergency beyond the control of the bus driver Murphy, which caused him to turn the bus suddenly, as this record discloses, to the right, thus causing the bus to strike the leaning power pole. Thus it is contended by defendants' counsel that this case is controlled by the case of *Tochek* v. *Monongahela Transport Co.,* 109 W. Va. 20, 25, 152 S. E. 776, 778, in which a judgment in favor of plaintiff, a passenger for hire, was reversed by this Court on the ground that the emergency involved in that case was not created by the bus driver's negligence, and that "Even if he [the bus driver] did not exercise the soundest judgment in such situation, his failure to do so would not create liability. 'The rule, therefore, resolves itself to this: That a person confronted with a sudden peril or emergency will not be held responsible for the consequence of an act or course of action, or omission, which, had he indulged in under normal circumstances, would charge him with negligence; except that he will be held responsible for such acts or omissions which an ordinary prudent person would have avoided even in an emergency or peril similar to the one in question.' Vartanian, The Law of Auto., §6." Because the approach of the automobile created a situation that may have caused the existence of an emergency, which then and there required some action on the part of Murphy, the plaintiff seeks to recover under the exception contained in the quotation in the *Tochek* case from Vartanian, The Law of Automobiles.

With the factual issue thus crystallized by the arguments of counsel for the plaintiff and the defendants, the happenings immediately before plaintiff was injured become most pertinent in the decision of this case. As the bus proceeded in a southerly direction along Riverside

Drive and around the "sharp" curve to the north of the power pole, Stokes, who was seated in the fourth seat from the rear, saw the oncoming car on the wrong side of the road when the bus reached the pole at a distance of fifty yards, or one hundred and fifty feet, which, this witness testified, was as far as he could see. On the other hand, the defendant Murphy testified that the bus was about twenty to thirty feet from the pole when he first saw the automobile coming toward him on the wrong side of the street; and that the oncoming car was only thirty to thirty-five feet away when he started to pull the bus to the right. If Stokes' testimony is true, and we should take it to be true, under the ruling in the *Fielder* and like cases heretofore cited, at the time the bus reached the pole, Murphy could have seen the oncoming car one hundred and fifty feet away, plus whatever distance there was between the operator's seat and the seat occupied by Stokes. So, if Murphy, as he testified, saw the oncoming car, when the bus was twenty to thirty feet from the pole, though Stokes did not see the car until the bus was at the pole, it must be remembered that Murphy, and not Stokes, a passenger, was charged with the primary duty to look; and while there is evidence to the effect that the oncoming car and the bus passed just as the bus reached the pole, the testimony of Stokes is equally credible, and that being so it should be taken as true. In so taking that evidence, we think the jury had the right to find, as it evidently did, that even if there was an emergency created by the oncoming car, if Murphy had used the high degree of care required of him to keep a proper lookout, he would have seen the approaching car at least one hundred and seventy feet away, and, in our opinion, the jury had the right to find that the bus driver had ample time, if he had kept a proper lookout and had used reasonable care in the appraisement of the situation, to have turned the bus gradually to the right and not so suddenly as to cause it to swerve first to the left and then to the right. It was for the jury to say that if such gradual turning had occurred, plaintiff's arm would not have been thrust through the open window so that it was caused to

strike the pole; and he would not have been jerked forward so violently that his face was thrown against the seat in front of him, or against some other part of the bus between the seats.

This case on the question of defendants' primary negligence, not only comes within the rule established in the *Isabella* case, but, in our opinion, on the important question of primary negligence is stronger from plaintiff's viewpoint than the *Isabella* case. In the *Isabella* case, the driver of the bus testified that he first saw the oncoming truck, which created the emergency, about one hundred and fifty to two hundred feet away; and he testified that he thought it would move over to the proper side of the road in order to allow the bus to pass. The Court held in that case that when the bus driver "realized that the truck did not move to the proper side of the road, it was too late to stop, and the only course open to him then was to drive on the berm." In that case there was no dereliction on the part of the bus driver, as here, in failing to keep a proper lookout. The bus driver in the *Isabella* case did see the oncoming truck a considerable distance away: in the instant case the bus driver, taking Stokes' testimony as true, could have seen the oncoming car, travelling at not more than thirty miles an hour, about the same distance away that the bus driver in the *Isabella* case actually saw the approaching truck. But he did not see it, and it was for the jury to say that he did not keep a proper lookout and act promptly.

Counsel for the bus company, however, assert as the second ground of error that the proximate cause of plaintiff's injuries was the negligence of the driver of the automobile in driving to the left of the center line of the street, when meeting the oncoming bus, combined with the negligence of the power company in obstructing a public street with a power pole so placed in the ground that it leaned over the travelled portion thereof. In this ground of error we see no merit. It may be the oncoming car created an emergency, as heretofore indicated; but after the emergency occurred it was for jury determination whether

the defendant bus driver had an opportunity to avoid injuring plaintiff. If the driver of the oncoming car was negligent in creating an emergency, in our opinion, defendant bus driver likewise was negligent in the manner we have heretofore suggested, and it was for the jury to say that his negligence proximately resulted in plaintiff's injuries.

As the third ground of error defendants assert that "The physical facts conclusively show that plaintiff was riding the bus with his arm protruding from the window, when it [the bus] struck the pole, notwithstanding his oral testimony, and the finding of the jury, to the contrary." The factual question arising on this ground of error was solved by the jury when it negatively answered the following of two special interrogatories submitted by the defendants at the conclusion of the evidence and addressed to the jury: "Question No. 1: Immediately before striking the pole, if you believe the bus did strike the pole, was plaintiff riding in the bus with his elbow, or a portion of his arm, protruding from the window of the bus at the time and place of the injuries to him?" As we have heretofore stated, plaintiff testified that at the time he was injured, he had his elbow and a part of his arm on the window sill, along the stationary part of the window; that the front part of the window was open; and that his hand was resting on the suit box in front of him on substantially the same level as the rest of his arm. No other witness saw the position of plaintiff's arm prior to the injury, except plaintiff's witness, E. E. Cassell, who, standing in the aisle a short distance in front of the seat in which plaintiff was sitting, facing to the right so that he had an unobstructed view of plaintiff, testified that five seconds before he felt the sudden impact of the bus, he saw plaintiff's arm on the sill, but did not notice the position of plaintiff's hand. This witness was unable to state whether during the intervening five seconds plaintiff had made any change in his position. While it is true, as contended by defendants, that the pole leaned in such manner that if the top of the bus was placed against it, the pole would not strike the window or any part below it,

this evidence, if true, and it evidently is because it is the result of an engineer's measurements, does not render incredible or unsubstantial plaintiff's testimony to the effect that he was thrown violently forward and to the right when he felt the impact on his arm, which, taken together with the fact that both the sliding, as well as the stationary part of the window, was shattered, in our opinion, amply justified the jury in giving its negative answer to special interrogatory No. 1.

The foregoing disposes of all of the grounds of error asserted by counsel for defendants. Since, in our opinion, these matters are without substantial merit, we reverse the judgment of the Circuit Court of McDowell County setting aside the verdict in plaintiff's favor, and remand this case to the circuit court of said county with direction that judgment be entered on the verdict in favor of plaintiff and against both defendants in the amount of five thousand dollars.

*Reversed and remanded with directions.*

Fox, Judge, dissenting:

I am unable to concur in the majority opinion in this case for two reasons. First, I think the Court has failed to give to the action of the trial court, setting aside the verdict returned by the jury, that consideration to which the ruling of any trial court is entitled. It is true, of course, that on a motion to set aside a verdict, the litigant in whose favor such verdict was returned is entitled to have the evidence in his favor considered in the light most favorable to him; but on the other hand, the judgment of a trial judge who sits in the case, hears the testimony, observes the witnesses who testify, and is in every way familiar with the case, is entitled to consideration and respect.

Second, the action of the trial court in setting aside the verdict in this case was based entirely upon its view that no negligence, on the part of the defendant corporation or its driver, had been shown in the case, and in this view I fully concur. The defendant's bus was being driven

along a public highway, on its right side of the road, and within two feet of the right side of the paved portion of the highway. What, I think, was an emergency arose, in that an oncoming motor vehicle was approaching the bus, and occupied at least a part of the right side of the highway in the direction in which the bus was travelling. There were three things which the bus driver could have done. He could have suddenly stopped the bus; he could have driven ahead with the probable consequence of colliding with the approaching vehicle; or he could have done what he did do, and that was turn his bus to the right as far as the situation would permit. He did turn his bus to the right, but still kept within the paved portion of the highway, so that the distance he swerved to the right was not in excess of two feet. In doing so, I do not think he was guilty of negligence. It just happened that a leaning pole on the right side of the highway scraped the top of the bus, and there is evidence that this may have caused plaintiff's injury. Much stress is placed on the fact that the bus driver probably knew of the location of this leaning power pole. To my mind, this had nothing to do with the fact the bus was turned to the right at the point near this pole. The bus driver could not select the point where he was compelled to turn to the right, and the fact that the leaning pole was at that point was a mere coincidence.

Under the holding in this case there is no possible way by which a bus driver in this or a similar case can be held free from fault. As stated above, if he stops his bus and any injury occurs, an injured person would no doubt be entitled to blame the driver; if he plunges ahead and collides with approaching motor vehicles, it would be contended that he could have turned to the right and escaped the collision; and now where, as in this case, he did turn to the right, and probably did the only thing that saved a serious collision with the oncoming vehicle, he is held responsible for his conduct. I do not think any negligence is shown. Therefore, I would affirm the judgment of the Circuit Court of McDowell County, setting aside the verdict and awarding a new trial.

In my opinion, the case of *Tochek* v. *Monongahela Transport Co.*, 109 W. Va. 20, 152 S. E. 776, states the correct rule. I agree that in the case of *Isabella* v. *West Virginia Transportation Co.*, 132 W. Va. 85, 51 S. E. (2d) 318, the principles announced in the *Tochek* case were departed from. While participating in that case, I did not join in certain rulings of the majority. I think we should not have departed from the principles announced in the *Tochek* case, and this dissent is a last futile protest against principles, now apparently established, which fails, in my judgment, to do justice in at least one aspect of cases growing out of actions of drivers of motor vehicles when an emergency situation is involved.