## SOUTHERN RY. CO. v. BELL, Sheriff.
### No. 4601.

Circuit Court of Appeals, Fourth Circuit.
Aug. 9, 1940.

James H. Corbitt, of Suffolk, Va., and Thomas B. Gay, of Richmond, Va., for appellant.

Robert M. Hughes, Jr., of Norfolk, Va., and J. Edward Moyler, of Franklin, Va., for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

In an action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51, the District Judge, sitting without a jury, rendered a judgment for $2,500 against the Southern Railway Company in favor of the administrator of the estate of Louis Seaborn, a section laborer on the railroad. Seaborn committed suicide while at work by throwing himself in front of a passing train; but the judge, adopting the plaintiff's theory of the case, held that the Railway Company was negligent and therefore liable in damages for the death, in that the foreman in charge of the gang, of which Seaborn was a member, had knowledge that he was mentally deranged and unable to take care of himself on the day of his death, and yet permitted him to participate in hazardous work on the Railway Company's right of way.

The appellant raises a number of questions as to the sufficiency of the evidence to show that substantial pecuniary damage resulted from the death of the deceased. But we come at once to the heart of the case, for we are unable to find any substantial evidence in the record on which to base a determination of liability. With regard to the question of insanity, it is conceded that Seaborn had been working on the railroad under one of the foremen in question for eighteen years, and that prior to the day of his death he had shown no evidence of mental derangement. There were, however, certain incidents on that day which indicated abnormality, or eccentricity, some of which came to the attention of the foreman in charge of the work. The District Judge based his conclusion on these circumstances and set them out as follows in a memorandum opinion:

"When Seaborn arrived to go to work that morning foreman Gill, who had known him many years, noticed that Seaborn acted strangely and looked wild. Gill asked a section hand, 'What is the matter with Louis this morning? He is drunk, isn't he?' to which the hand replied 'No sir, I think he is crazy.' Gill further testified: 'I kept a watch on him and it looked like he was a little bit strange and I didn't want any of my men to get hurt. * * * I just stayed away from him as much as I could because I did not want the men hurt.'

"'Q. You said what, Mr. Gill? I did not get your answer. A. I said I worked my men away from him and stayed away from him as much as I could. I would not work up beside him, because I thought he worked kind of careless and that he might throw down a maul on somebody and hurt them and cause me to have a personal injury report to make, or something of the kind.'

"About 9:30 A. M. following Seaborn's behavior in throwing a rail off a car, Gill feeling that Seaborn was getting worse, took the matter up with foreman Spain and told the latter that he ought to send Seaborn away because he was working reckless and might get some of the men hurt. Gill testified: 'He was kind of working reckless at the time. Sometimes he would pick up a maul or lining bar and throw it back and not look where he would throw it. He was working in a kind of careless way. * * * That was my reason and what I told Mr. Spain why I wanted to get him out of the gang—that he might throw something on somebody, that he was working careless.'

"At noon Seaborn was sent by one of the foremen for a bucket of water. He went away with the bucket, returned with only some leaves therein, threw the bucket down, saying that he could not find the spring because somebody had stolen it. Thereupon, Gill again told Spain that if he, Gill, were in Spain's place, he would send Seaborn home, to which Spain replied that he 'had about three more hours to make, and if

he didn't seem to be no better, he would not bring him back to work any more.'"

In estimating the force and effect of this testimony, other facts established by the evidence of the same witnesses should not be left out of account. The circumstance of throwing a rail off a push car took place while the car was being operated by Seaborn and other workmen on the railway line, and he thought that he heard the approach of an unseen train, which was about due, coming around a bend in the track, a circumstance which obviously indicated that the deceased desired to avoid injury from the train. It was also proved that Seaborn had a strong aversion to being sent for water, preferring any other kind of hard work. In addition, convincing testimony was given by Gill, the plaintiff's main witness, which showed that he had no real fear of injury by Seaborn in the course of his work. Gill testified that during the day, directly after Seaborn threw the rail off the car, it was necessary to cut the rail in two parts. In order to accomplish this Gill himself held the cleaver or cold chisel and instructed Seaborn to strike it with a heavy long handled spike maul. Negligent performance of this work by Seaborn would have caused serious injury or loss of life to Gill. There were other workmen present who could have done the work in place of Seaborn had Gill so desired. A somewhat similar incident occurred when the other foreman voluntarily placed himself in a dangerous position when working with Seaborn. It is unreasonable to suppose that either foreman would have risked his life in this way if he was apprehensive of a negligent or insane act on Seaborn's part.

The judgment of the District Court that the Railway Company was liable for Seaborn's death can be justified only on the theory that Seaborn's superiors had reason to believe that his mental condition was so abnormal that he was unable to care for himself, and was therefore likely to be injured by a passing train or in some other manner. This is true because it is a sound rule that one is liable for only those consequences "which in the light of attendant circumstances, could reasonably have been anticipated by a prudent man, but not for casualties which, though possible, were wholly improbable". Wyatt v. C. & P. Telephone Co., 158 Va. 470, 163 S.E. 370, 373, 82 A.L.R. 386; St. Mary's Hospital v. Scanlon, 8 Cir., 71 F.2d 739;

Fort Smith Gas Co. v. Cloud, 8 Cir., 75 F.2d 413, 97 A.L.R. 833.

Some of the actions of the deceased on the day of his death, which were brought home to his foreman, were undoubtedly unusual or peculiar, but his conduct evidently did not lead them to fear him on their own account or give them reasonable ground to fear that he himself was in danger of injury or loss of life. On the contrary, they had seen conduct on his part manifesting a natural fear of trains and an ability to take reasonable precautions to avoid them.

The judgment will be reversed, and as the defendant in due course of the trial moved the District Judge for a directed verdict in its favor, and after the verdict moved the court to set it aside and enter judgment in its favor, the case will be remanded to the District Court in order that a judgment for the defendant may be entered in accordance with Rule 50 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

Reversed and remanded.