STATE *ex rel.* J. W. COOLE

*v.*

EDGAR B. SIMS, AUDITOR OF STATE OF W. VA.

(No. 10209)

Submitted January 11, 1950. Decided January 31, 1950.

GIVEN, JUDGE, not participating.

RILEY, JUDGE, dissenting.

*Salisbury, Hackney & Lopinsky, John G. Hackney, Emerson W. Salisbury, Jackson D. Altizer,* for petitioner.

*William C. Marland,* Attorney General, *Eston B. Stephenson,* Assistant Attorney General, *Milton S. Koslow,* for defendant.

FOX, JUDGE:

This is a proceeding in mandamus seeking to compel Edgar B. Sims, as Auditor of the State of West Virginia, to honor a requisition in the sum of $5,000.00 in favor of J. W. Coole, authorized to be paid to him under Chapter 13, Acts of the Legislature, Regular Session, 1949, based upon the alleged illegal imprisonment of the said Coole in the jail of Jackson County, West Virginia, and in the State Penitentiary, for an offense charged against him, and of which he claims to be innocent, giving rise, as the Legislature found, to a moral obligation on the part of the State to pay the same. The requisition was presented to the Auditor in late June, 1949, and was refused by him. On petition of the relator, filed herein on September 19, 1949, we awarded a rule requiring the said Auditor to appear and show cause why a peremptory writ of mandamus requiring him to honor such requisition should not be awarded.

The relator, J. W. Coole, was indicted by a grand jury of Jackson County, West Virginia, on November 7, 1939, in the name of Junior Coole, alias J. W. Coole, which indictment alleged that the said Coole, on the _____ day of October, 1939 did, unlawfully, fraudulently, designedly and feloniously falsely pretend to one Ralph Mills that he was a farmer by the name of C. W. Lane, living in said county near the village of Kenna, and that as such pretended C. W. Lane he held in good faith a check pretended to be made to his order by one F. M. Cline, which he endorsed as said C. W. Lane, which check was in the words and figures following:

"Ripley, West Virginia Oct. 18, 1939

THE BANK OF RIPLEY

Pay to the
Order of C. W. Lane _____ $30.50/100
Thirty and _____ 50/100 Dollars

For Hogs                                    F. M. Cline       "

Endorsed: "C. W. Lane"

The indictment then further alleged that the said check was then and there used and transferred by said Coole to one Ralph Mills as a genuine check, for the purpose of purchasing hardware and other merchandise of the value of $8.22, which with consumers sales tax added thereto amounted to $8.39; and that said Coole then and there received on said check the sum of $22.11 in cash, which latter amount was received by him after the amount of the purchase price of the hardware and sales tax had been deducted from the amount of the check. It was alleged that the above described property so furnished and paid was that of J. B. Vail Hardware Store in the Town of Ripley, by which the said Ralph Mills was then and there employed as a clerk.

It will be noted that the offense charged against Coole was that of passing or uttering the check involved, and for the purposes aforesaid. There is no charge in the indictment that the check was written by Coole, and there

is no testimony in the case tending to establish that it was written by him. The charge was that he fraudulently, falsely and feloniously pretended to hold in good faith the said check, and used the same to obtain goods and money.

Trial was had in the case in the Circuit Court of Jackson County at its November Term, 1939. The identity of J. W. Coole, the relator in this proceeding, as the person who uttered the said check, was attempted to be shown by testimony of seven witnesses, all of whom positively identified the relator as the person who had passed the check or had some connection therewith. One of these witnesses, C. W. Riddle, identified the relator as a man who appeared at the Hunter Hotel in Ripley and requested him to fill out a check for him, and that this request was made on October 18, 1939, the date of the check copied into the indictment. He also filled out another check on the same date. He says that he did not sign the check and merely filled out the name of the payee, the date and the amount of the check. The two checks filled in by him on that occasion were introduced in evidence in the trial, and the written portions of the check and the signature appear to be in the same handwriting, which, to some extent, raises doubt as to the credibility of Riddle's° testimony. With this exception there is no doubt cast upon the credibility of the witnesses who identified the relator as being the man who uttered the check set out in the indictment, and who obtained merchandise and money thereon.

The defense of the relator herein was in the nature of an alibi. He testified that prior to his imprisonment in the Jackson County Jail in early November, 1939, he had never been in Jackson County; and that on October 18, 1939, or thereabouts, when the check was supposed to have been uttered by him in said county he was elsewhere; and he offered other testimony to support that contention. The relator was represented by counsel of his own choosing, and made full defense to the charge against him. The jury sitting in the case returned the following verdict:

"We the jury find the defendant guilty as charged in the within indictment. We also recommend mercy."

A motion to set aside the verdict was promptly entered, which was not disposed of until April 6, 1940, at which time it was overruled, and the defendant, the relator here, sentenced to the penitentiary of this State, under Chapter 24 of the Acts of the Legislature, 1939, therein to be kept and treated in all respects according to law. Thereafter, an application was made to this Court for a writ of error to the judgment aforesaid, which application was denied on the 7th day of August, 1940.

The relator was confined in the Jackson County Jail from the date of his arrest in November, 1939, until on or about April 6, 1940, when he was removed to the penitentiary of this State where he remained until the 15th day of November, 1940, when he was released on parole. On the 17th day of June, 1948, he was, by the Governor of this State, granted a full pardon for the offense of which he had been convicted as aforesaid, it being stated in the pardon certificate that certain investigations "offer strong indication of a miscarriage of justice in connection with the facts and evidence of the case", referring to the case in which relator was convicted in the Circuit Court of Jackson County.

On October 8, 1948, the relator filed his petition in the State Court of Claims, praying for an award of damages in the sum of $50,000.00 for injury and damage to his person and reputation as the result of his wrongful conviction and confinement in jail and penitentiary. Evidence was taken in the case which came on for hearing in the Court of Claims on November 12, 1948, and an award made by a majority of the court in the amount of $10,-000.00. Subsequently, this award was presented to the 1949 session of the Legislature, and an appropriation in the sum of $5,000.00 was made to be paid to the relator out of general fund revenues of the State.

Relator's claim is based upon the contention that it has been clearly established that he was not guilty of the of-

fense of which he was convicted in the Circuit Court of Jackson County, notwithstanding the verdict of the jury aforesaid, and the judgment rendered thereon; and as a basis for said contention that: (1) The relator was not in Jackson County on the date when the check quoted in the indictment was uttered and that, in effect, the case is one of mistaken identity; (2) there is no showing that the relator wrote the said check or of the endorsement thereof; (3) subsequent to his arrest on the charge contained in the indictment, as later returned by the grand jury, other checks of like nature were passed throughout the Jackson County section, and perhaps elsewhere, with which relator could not have been connected; (4) the fact that a member of the Department of Public Safety had communicated to the prosecuting attorney of Jackson County his belief that relator was not guilty of the charge against him, by reason of the fact that he could not have written the checks, and the further fact that checks of that nature were circulated in that section subsequent to his arrest, and the failure of the prosecuting attorney to use his informant as a witness to develop that belief before the jury; and (5) the subsequent investigation made by the same member of the Department of Public Safety in connection with the handwriting of other people, notably one person confined in the penitentiary of the State of Ohio; all tended to establish that relator was unjustly convicted.

It is true that the testimony taken before the Court of Claims develops that the prosecuting attorney of Jackson County, now deceased, was informed by a member of the Department of Public Safety that, in his opinion, the defendant, the relator here, was not guilty of the offense for which he was then being tried, and gave his reasons for that belief; and that the prosecuting attorney, for some reason, did not give his informant an opportunity to testify to his belief before the trial jury. It is true, however, that during the trial this doubt was communicated to the counsel for relator, and they did not use the officer in their client's defense. It is also shown that Coole, the relator here, was taken to Ravenswood where he was

mistakenly identified as the man who had passed checks in that town at a time when he, Coole, was detained in the Jackson County Jail, and could not, in the ordinary course of events, have been in the Town of Ravenswood and passed the said checks. All of these beliefs and events appear to have been within the knowledge of both the prosecuting attorney and counsel for Coole, and apparently were not considered of such importance as to justify the use of the testimony of the police officer. Nor were these facts and events urged on the motion for a new trial, nor indeed coüld they have been so used because counsel, having knowledge of these facts before the case was submitted to the jury, could not rely upon them thereafter as newly discovered evidence, as grounds for a new trial, nor as reasons for new trial on any ground. When the case was presented to this Court these questions were not raised, nor could they have been raised.

We do not attach any importance to the failure of the prosecuting attorney to use the member of the Department of Public Safety as a witness, nor the failure of counsel for the defense to do so. The theory of the State was apparently that it was unimportant who had written the check involved, inasmuch as the indictment only covered the uttering of that check for the purpose of obtaining merchandise, goods and money. Counsel for defense, relying upon the contention that their client was elsewhere, may not have deemed it advisable to interject into the case any other issue. Whatever the reasons, these facts were not developed in the trial, and inasmuch as they could not have been used for the purpose of obtaining a new trial, we fail to see their significance in connection with the case at bar.

Subsequent to the trial in the Circuit Court of Jackson County, a member of the Department of Public Safety, not being satisfied with the outcome of that trial, made further investigation of the case. He went to the state penitentiary at Columbus, Ohio, where he interviewed an inmate whom he suspected of being the person who actually wrote the check uttered in Jackson County on or

about October 18, 1939. He obtained from him samples of his handwriting which, in his opinion, were simulated, and not his true handwriting. Nevertheless, he expresses the opinion that this Ohio inmate was the person who wrote the check allegedly uttered by relator. Another member of the Department of Public Safety has testified to his belief in the innocence of relator by reason of the fact of the uttering of other and similar checks in that section of the State, subsequent to relator's arrest on the charge on which he was convicted.

The weakness of relator's claim lies in the fact that he was never charged with writing the check here involved, and on the trial of the charge contained in the indictment against him in the Circuit Court of Jackson County it was not material whether the check was written and endorsed by him or by some other person. Riddle assumed responsibility for writing a part of the checks introduced in evidence, not including the signature. It seems probable, from a comparison of the checks that if he wrote any part of them he wrote all of them including the signature. But that fact was immaterial. It was not the writing of the check but the uttering of the same which constituted the offense with which relator was charged and on which he was convicted. This being true, the fact that other and similar checks were uttered in that part of the State, subsequent to the arrest of relator, tends to support the theory that he could not have written the checks, and that some other person must have written them; but this contention and belief, if justified, has slight if any bearing upon the charge that relator, in Jackson County, on or about October 18, 1939, passed a check with the felonious purpose of obtaining goods and money thereon. It may be that the relator was not the person who uttered these checks at the time and place mentioned above. It may be a case of mistaken identity. It may be that the jury verdict finding the relator guilty, based upon the identification of the seven witnesses who testified as to his identity, was an erroneous verdict. But there is nothing in the record before us, produced subsequent to the trial on the indictment which would justify us in holding that relator

was not in the Town of Ripley, in Jackson County, on the day this check was uttered, or that he did not utter the same. All of the evidence produced before the Court of Claims merely tended to show the passing of other like checks, and the doubt created as to whether relator could or did write any of these checks, and failed to reach the decisive question of his identification as the person who uttered the check copied in the indictment, and for which offense he stands convicted. The question raised amounts to this: Whether a person indicted by a grand jury, tried by a jury, under the guidance and supervision of the court and counsel of his own selection, and after what the Circuit Court and this Court have held to be a fair trial, may, almost ten years later, have the matter of his identity retried before the Court of Claims and the Legislature.

We are not dealing with a case where there has been an admitted miscarriage of justice, growing out of confessedly perjured testimony, or confession by some third party that he committed a crime for which a defendant had been convicted. There are different views as to what should be done in such cases. In the case of *Campbell* v. *State of New York,* 186 Misc. 586, 62 N. Y. Supp. 2d 638, a very large sum of money was appropriated by the New York Legislature as compensation for injuries sustained by a person who had been unjustly convicted of a felony, and where it developed that the real perpetrator of the crime had later confessed his guilt. On the other hand, the case of *Allen* v. *Board of State Auditors,* 122 Mich. 324, 81 N. W. 113, there is contrary holding. Being of the opinion that the case at bar has no such showing of the innocence of the relator of the crime with which he was charged and convicted in the Circuit Court of Jackson County, we do not reach the question of what should be done in a case where such innocence is clearly shown. Nor do we think we reach, in this case, the question of the weight and finality to be given the final adjudication of the courts of the State as to the guilt or innocence of any person charged with crime.

We have not considered the pardon issued by the Gov-

ernor to the relator as having any bearing on this case. Under Section 11, Article VII of our Constitution it is provided that the Governor has, in effect, unrestricted power to grant reprieves and pardons after conviction, and in *State ex rel. Stafford v. Hawk,* 47 W. Va. 434, 34 S. E. 918, it was held that:

"The power to reprieve in all cases of felony is vested in the governor of this State, by the constitution thereof, where the necessity therefor exists. He is the sole judge of such necessity, and his conclusions are not reviewable by the courts, but are binding on the other departments of the government."

The Governor may issue a pardon in any case or for any cause whatsoever; but, under the Constitution, he is required to report the issuance of reprieves and pardons to the Legislature and give his reasons therefor. Presumably in this case he made such report and the reason given was that stated in the body of the paper signed by him, namely, that certain investigations theretofore made showed "strong indication of a miscarriage of justice in connection with the facts and evidence of the case." The Governor might just as well have issued a pardon for any other reason which seemed to him valid, and without regard to the supposed guilt or innocence of the person effected thereby. It is a matter of common knowledge that pardons are often granted to people whose guilt is beyond question, and even to those who have confessed guilt. They are sometimes issued where doubt of guilt exists. But many times pardons are issued where it is believed that the ends of justice have been served; that the individual affected has paid his debt to society; and society will be better served by the release of a person convicted of crime, and the restoration to his rights of citizenship.

What is a pardon? In 39 Am. Jur. 523, it is stated:

"A definition which has been designated by the courts as probably the most accurate and comprehensive, and as best expressing the legal signification of the word, is that a pardon is a decla-

ration on record by the chief magistrate of a state or country that a person named is relieved from the legal consequences of a specific crime. Another definition commonly given is that a pardon is an act of grace proceeding from the power intrusted with the execution of laws, which exempts the individual on whom it is bestowed from the punishment the law inflicts for a crime he has committed. * * *"

It is true that the operation and effect of a pardon is generally understood to restore the person pardoned to all of his rights as a citizen. In 39 Am. Jur. 550, it is stated:

"In the case of a full pardon, it relieves the punishment and blots out of existence the guilt of the offender to such an extent that in the eye of the law he is as innocent as if he had never committed the offense."

That statement is a correct one. But it must be interpreted to apply to the standing of a person pardoned in the community in which he lives to make certain that he shall not thereafter be in anywise legally embarrassed from the commission of the offense of which he has been pardoned. It will not do to say, nor do any of the authorities say, that the granting of a pardon wipes out the conviction and renders the party innocent dating back to the time he was convicted. If that rule be followed then every person pardoned, for whatever reason, even though his conviction was based upon his confession of guilt, would be entitled to use that pardon as the basis for claiming compensation for the period in which he was confined under his conviction. Giving to the pardon of the Governor its fullest effect, it does not, we think, afford any basis whatever for a finding of innocence on the part of the relator. Neither the Governor of this State, nor the Court of Claims, nor the Legislature, has any constitutional power to pass upon the guilt or innocence of a person charged with a crime. That power rests, under our Constitution, in the judicial department of the State government.

In the case of *State ex rel. Cashman* v. *Sims, Auditor,*

130 W. Va. 430, 43 S. E. (2d) 805, we held:

"A finding by the Legislature of the existence of a moral obligation of the State, based upon facts which give rise to a juristic condition, is subject to investigation and consideration by the courts; and the determination of the existence of such obligation is a judicial, not a legislative, function."

Being of the opinion that the record before us, and the record before the Court of Claims and the Legislature, does not clearly disclose that relator was innocent of the offense of which he was convicted in the Circuit Court of Jackson County, there was no basis for the legislative finding of a moral obligation on the part of the State of West Virginia to compensate him for the time he was confined in prison for the offense of which he was convicted, it follows that the writ prayed for must be denied.

*Writ denied.*