STATE *ex rel.* J. A. COX

*v.*

EDGAR B. SIMS, *Auditor*

(No. 10588)

Submitted May 26, 1953. Decided June 16, 1953.

RILEY, JUDGE, dissenting.

*Chas. E. Mahan, W. Holt Wooddell* and *Keith Cunningham,* for petitioner.

*John G. Fox, Attorney General* and *Arden J. Curry,* Assistant Attorney General, for defendant.

HAYMOND, PRESIDENT:

This is an original proceeding in mandamus in which the petitioner, J. A. Cox, seeks a writ from this Court to compel the defendant, the Honorable Edgar B. Sims, Auditor of the State of West Virginia, to issue a warrant in due form upon the State Treasurer for the payment of an appropriation in favor of the petitioner and five insurance companies. The claim involved in this proceeding is against the State Road Commission and is for compensation for property loss and damage sustained by the petitioner as the result of a fire which originated in a garage occupied and operated by the commission in Huttonsville, Randolph County, West Virginia, on the morning of April 21, 1948, and which spread to and destroyed the store building and a large portion of its contents owned by the petitioner located at a distance of a few feet from the garage. The claim is based on the alleged negligence of an agent and employee of the commission in starting the fire in the garage and in failing

to prevent the fire from spreading to the nearby property of the petitioner.

Upon a hearing the State Court of Claims, on June 23, 1950, by a two to one vote, allowed the claim and awarded compensation in the amount of $22,580.71. This award was certified to the Legislature at its Regular Session, 1951, and referred to appropriate committees of each House. After hearings and investigations by these committees the award was reduced to $21,080.71. In making the original award a majority of the State Court of Claims found that the origin of the fire and its spread and communication to the nearby property of the petitioner resulted from the negligence of a mechanic of the State Road Commission in the course of his employment. By Senate Bill No. 82, passed March 10, 1951, effective July 1, 1951, and approved by the Governor, the Legislature, in considering a number of claims of different persons against the State and some of its agencies, including the instant claim against the State Road Commission, adopted as its own the finding of fact of the State Court of Claims as to the origin and the spread of the fire, declared the claim in the reduced amount of $21,080.71, to be a moral obligation of the State, and directed the Auditor to issue a warrant for its payment from available funds appropriated for that purpose. Chapter 28, Acts of the Legislature, 1951, Regular Session. It also made an appropriation of the sum of $21,-080.71 for the payment of the claim. Chapter 8, Acts of the Legislature, 1951, Regular Session.

In fixing the amount of the award both the State Court of Claims and the Legislature allowed to each of the five insurance companies the amount of insurance paid by each company to the petitioner and which each company claimed by way of subrogation. The aggregate of the amounts paid by the companies was $7,000.00 and the residue of the total award of $21,080.71, amounting to $14,080.71, was allowed in favor of the petitioner. Each of the five insurance companies, however, has released

its claim of subrogation against the petitioner and the State, and as a result, the claim involved in this proceeding is the individual claim of the petitioner for his uninsured property loss in the amount of $14,080.71. The amount of the claim is not disputed and the parties by stipulation have fixed the uninsured property loss of the petitioner at the sum of $14,080.71. The Auditor refused to pay the foregoing claim from the appropriation made by the Legislature for that purpose and on April 21, 1953, the petitioner instituted this original proceeding in this Court. The defendant filed his written demurrer to the petition, assigning numerous grounds, and on May 26, 1953, the issues presented by the petition and the demurrer were submitted for decision upon the written briefs and the oral arguments in behalf of the respective parties.

The facts upon which the claim is based and the finding of the State Court of Claims, adopted by the Legislature, are set forth in some detail in the opinion of that court and are embraced in their entirety in the transcript of the evidence introduced before it; and the opinion and the transcript of the evidence are made a part of the record in this proceeding by written stipulation of the parties.

The garage in which the fire occurred was a one story wooden structure with a concrete floor and a roof of rubberoid composition. It is conceded that it was not of fireproof construction. It was situated on the same side of the street as the store building of the petitioner and the near side of each building was separated by an alley from nine feet to eleven feet in width.

About seven thirty o'clock on the morning of April 21, 1948, a crew foreman of the State Road Commission brought to the garage for repair one of its trucks the gasoline tank of which was leaking at the time. The truck was driven forward a short distance inside the front of the garage and placed on the concrete floor about four feet from the side of the garage nearest the build-

ing of the petitioner. Immediately after the truck was placed in that position, the mechanic employed at the garage, who was the only person then present, went under the rear of the truck on a movable appliance known as a creeper which moved on four steel rollers and, in preparing to repair the leak in the tank, drained five gallons of gasoline from the tank into a large open can and closed the drainage valve on the tank. He then pushed the can from under the truck to a position between the fender of the truck and the nearest side of the garage and while on the creeper moved it toward the rear of the truck for the purpose of withdrawing from beneath the truck and getting another container for use in draining the remaining gasoline from the tank. While the creeper was in motion and still under the rear of the truck the gasoline which had leaked from the truck and had spread over a circular space of eight or ten feet on the concrete floor suddenly took fire. The fire spread quickly and ignited, in this order, the clothing and parts of the body of the mechanic, the truck, the gasoline in the nearby open container, the wall of the garage adjacent to the building of the pettioner and the ceiling of the garage. As soon as the mechanic could extricate himself from beneath the truck he ran from the garage through the nearby front door and extinguished the fire on his clothes and on parts of his body. He reentered the garage immediately and attempted to extinguish the fire by the use of a small fire extinguisher attached to the truck. Being unable to extinguish or check the fire and realizing that it was then beyond his control, he ran to the store of the petitioner, told him the garage was afire, and asked him for help. He then returned to the garage and drove the burning truck from the building. Shortly after it had been removed another truck which had been placed in the garage before the fire was driven out of the building by another person who had come to the scene of the fire.

The fire originated at about ten minutes after eight o'clock on the morning of April 21, 1948, and within

approximately one hour after it started it had completely destroyed the superstructure of the garage, the building of the petitioner, and all its contents except a relatively small portion of them which the petitioner and several persons assisting him were able to remove from his building before it was completely enveloped by the flames, and had also damaged a nearby residence of another person. At the time of the fire there was no adequate supply of water available for extinguishing or checking the spread of fire in Huttonsville. The nearest fire departments were at Elkins and Dailey, several miles distant from the fire, and these departments, responding to a call for help, arrived too late to save either the garage or the building of the petitioner. The only safeguards against fire in the garage were two small fire extinguishers, one large fire extinguisher, and four or six buckets. The buckets were labeled and distributed along the inside of the walls, and each of them contained ten quarts of chemically treated sand.

The mechanic was the only eye witness of the origin of the fire and he is the only person who knows how it occurred. Several witnesses, including the petitioner, described the fire in its early stages, but none of them saw or discovered it in time to extinguish it or to check its progress by the use of the equipment available for that purpose.

On his examination in chief the mechanic gave this testimony concerning the origin of the fire and his efforts to extinguish it and to check its progress: "Q. Where was the truck setting at that time? A. Just inside the door of the garage, I would say four feet away from the wall. Q. After you drained the first five gallons out into a can, where did you set that can? A. I had just pushed it out by the side so I could get out and take it on away and get another container. * * *. Q. Did you get another can? A. I didn't, as I slid out from under the truck the whole thing went up in flames. Q. Do you know what started this fire, that is to say it went up in flames? A.

I do not. * * *. Q. Do you know whether or not when you were there draining the gasoline tank on that truck any of it spilled on the floor in the garage? A. The tank was dripping from where the leak was in it, or whatever it was. It was dripping there continuously and the gas was spread all over. * * *. Q. What kind of tools did you have when you went down underneath the truck on the creeper to drain the gasoline tank? A. As well as I remember, I had a pair of pliers, a screw driver and a wrench. Q. Any other tools? A. No other tools that I know of. Q. Did you have an acetyline torch? A. No, sir. Q. Did you have a blow torch? A. No, sir. Q. Were you smoking at the time? A. No, sir, * * *. Q. Was it while you were sliding out from under the truck on the creeper, or sliding back under it, the fire started? A. When I slid out from under the truck. * * *. Q. Tell what happened then after that. A. Well, when I slid out there with the intention of going to get another container, the thing went up in flames and I got flames all over my clothes, my hands caught afire, and the side of my face, and a patch on the back of my neck, and I run out to the front of the garage and got my hands down like that and put the flames out, and the flames didn't last but a second, I expect the fumes settled on me, or something like that, and I run back in the garage and got the fire extinguisher and tried to put it out. Q. Where did you get the fire extinguisher? A. Out of the truck I was working on, and I saw I couldn't do nothing with it and I ran over to Mr. Cox's store and asked him to get some help in there, the garage was on fire, and Mr. Wamsley run in * * * and drove the other truck, and I drove the one out that was on fire, and we got the trucks out of the garage. * * *. Q. You tried at that time, with the fire extinguisher in that truck, to put the fire out that was burning it? A. I tried to put the fire out in the garage first. I couldn't do nothing with it. Q. At that time how far had the fire inside the garage spread? A. The fire spread all over under the truck, and the can I had set out there, the container, was afire all over, and

there was fire all over the wall and started across the ceiling overhead. * * *. Q. How long did it take the fire to spread and catch the framework of the garage? A. By the time I got the fumes out on me, the fire out on me, on the outside, I turned around and the fire was almost up to the ceiling then, just right up to the ceiling."

The mechanic was not subjected to cross examination, but when he was interrogated by a member of the State Court of Claims, he was asked these questions and gave these answers: "Q. How soon after the truck was brought into the garage and parked near the door did you commence to repair it, to take the tank out? A. I commenced immediately after it was brought in. Q. In the meantime some gas had dripped? A. Some gas had. Q. You say you got on this creeper to get under the truck? A. I did. * * *. Q. When you went in on this creeper did you take the five-gallon container with you? A. I don't know whether I put the can in first or went in first, but I had the can in reach so I could get it. * * *. Q. When you shoved the can out, how far did you get the can out? A. Just beyond the fender of the truck. * * *. Q. And then did you give yourself a lunge to come out? A. That's right. Q. And that is when the flames burst? A. Yes. Q. Exactly where did the flames burst out first, under the truck, or in this bucket? A. Under the truck, and then all over the floor and then the bucket."

This witness, a competent and experienced mechanic who continued to work for the State Road Commission in that capacity for several weeks after the fire, also testified that some time before the fire he had repaired a leaking gasoline tank on the same truck or another similar truck in the garage; and it is evident that he did so without the occurrence of fire or other mishap.

The maintenance foreman testified that the mechanic, immediately after the fire, said that he had drained five gallons of gasoline from the tank and had brought the container "out on his creeper and took the other five-

gallon bucket and put it back and went to creeping in under with his creeper" and that "the creeper must have made a spark on the concrete floor and it caught.", and that the mechanic had told him that the creeper "was bound to make a spark". During his testimony before the State Court of Claims, however, the mechanic, when questioned concerning his prior conversation with the maintenance foreman, stated that he had made no statements in such conversation that differed from his testimony. The maintenance foreman also expressed the opinion that "it looked like it might be possible that a spark" would result from the act of moving a creeper with metal wheels over gasoline upon a concrete floor and that the mechanic, in performing such an act, did not exercise due care. An insurance adjuster testified that he talked with the mechanic during the afternoon of the day of the fire and that he told the witness that gasoline had dripped over a large area of the floor and that when he pulled the creeper across the concrete floor the creeper caused sparks which ignited the gasoline. The petitioner testified that he talked several times with the mechanic about the fire and that he told him that he repaired the leaking tank on the truck near the door of the garage because that work was "a dangerous job", that the fire had "originated from a creeper.", and that "dragging" its metal wheels over the concrete floor had "created the spark".

The petitioner who heard of the fire soon after it started testified that when he learned that the garage was on fire he ran from his store toward the garage, that as he left the store the fire was burning under the truck, that the tire on its right rear wheel was on fire, and that the gasoline in the container was blazing with flames three or four feet high; that he went back to the store, got a bag containing fifty pounds of lime, and returned with it to the garage; that by that time the burning truck had been backed out of the garage and the fire in the garage had spread to the extent that he could not get near enough to the container to throw the lime on it;

that the flames had reached and were "lapping" the ceiling of the garage; that it was beyond control at that time; and that he then directed the persons present to carry goods from his store which they did. until the fire spread to his building and prevented them from continuing their efforts to remove the goods.

The testimony of the petitioner and several other witnesses was to the effect that gasoline service pumps, connected with an outside underground supply tank, were located inside the garage; that at the time of the fire there were in the garage some steel drums which contained gasoline, kerosene or lubricating oil; and that within several minutes after the fire began explosions occurred which increased the flames on the store building of the petitioner and caused it to burn more rapidly. It clearly appears from the evidence, however, that the location of the service pumps and the presence of the steel drums and their inflammable contents did not cause the fire; that the fire had reached the building of the petitioner before the explosions occurred; and that his store building would have caught fire if there had been no explosions.

To sustain the declaration by the Legislature of the existence of a moral obligation of the State in favor of the petitioner which would justify the payment by the defendant of the appropriation by the Legislature of public money for that purpose the petitioner relies primarily upon the conduct of the mechanic, as the agent and employee of the State Road Commission, in moving the creeper on the floor of the garage at the place where the gasoline from the leaking tank had accumulated and by so acting causing the origin of the fire, and in failing to exercise due care to check its progress and prevent it from spreading to the nearby property of the petitioner. This conduct by the mechanic, in conjunction with the inflammable character of the superstructure of the garage which admittedly was not of fireproof construction and the limited equipment available for the

prevention of its destruction by fire, the petitioner insists is conduct which would be judicially held to constitute negligence which proximately caused the loss sustained by the petitioner and would entitle him to a recovery against a defendant in an action for damages between private persons. If the foregoing conduct of the mechanic, as such agent and employee, in the then existing circumstances, may be judicially held to constitute negligence in an action for damages between private persons the moral obligation of the State in favor of the petitioner, as declared by the Legislature, should be sustained and the appropriation to pay it should be upheld by this Court. *State ex rel. Utterback* v. *Sims,* 136 W. Va. 822, 68 S. E. 2d 678; *Price* v. *Sims,* 134 W. Va. 173, 58 S. E. 2d 657; *Saunders* v. *Sims,* 134 W. Va. 163, 58 S. E. 2d 654; *State ex rel. Jordan* v. *Sims,* 134 W. Va. 167, 58 S. E. 2d 650; *State ex rel. Catron* v. *Sims,* 133 W. Va. 610, 57 S. E. 2d 465. In *Price* v. *Sims,* 134 W. Va. 173, 58 S. E. 2d 657, this Court held in point 1 of the syllabus that "A moral obligation of the State, declared by the Legislature to exist in favor of a claimant for negligent injury to his property, will be sustained, and a legislative appropriation of public funds made for its payment will be upheld, when the conduct of agents or employees of the State which proximately caused such injury is such as would be judicially held to constitute negligence in an action for damages between private persons." If, however, such conduct does not constitute judicially recognizable negligence in an action for damages between private persons, the declaration by the Legislature that a moral obligation of the State exists in favor of the petitioner and the appropriation for its payment must be held to be invalid. *State ex rel. Adkins* v. *Sims,* 130 W. Va. 645, 46 S. E. 2d 81; *State ex rel. Cashman* v. *Sims,* 130 W. Va. 430, 43 S. E. 2d 805, 172 A. L. R. 1389. In passing upon the validity of the moral obligation declared by the Legislature to exist in favor of the petitioner it is necessary to determine whether the acts of the agent and employee of the State Road Commission,

heretofore enumerated, constituted negligence which proximately caused the loss sustained by the petitioner.

The petitioner insists that in determining, in this proceeding, whether negligence was the proximate cause of the loss sustained by him, this Court should give controlling force and effect to the legislative finding that the conduct of the agent and employee of the commission was such as would be judicially held to constitute negligence in an action for damages between private persons. This contention is not tenable. A finding by the Legislature of the existence of negligence in a particular situation is based on facts which give rise to a juristic condition and is judicial in character. *Price* v. *Sims*, 134 W. Va. 173, 58 S. E. 2d 657; *State ex rel. Adkins* v. *Sims*, 130 W. Va. 645, 46 S. E. 2d 81; *State ex rel. Cashman* v. *Sims*, 130 W. Va. 430, 43 S. E. 2d 805, 172 A. L. R. 1389. Though this Court in reviewing the finding of the Legislature in cases involving its declaration of a moral obligation based on facts which give rise to a juristic condition has said that such finding is entitled to respect, *State ex rel. Adkins* v. *Sims*, 130 W. Va. 645, 46 S. E. 2d 81, or to great weight, *State ex rel. Catron* v. *Sims*, 133 W. Va. 610, 57 S. E. 2d 465, it has held in several cases that whether a moral obligation exists in any particular instance is a judicial question and that the finding by the Legislature of the existence of a moral obligation based on facts which give rise to a juristic condition is not conclusive or binding on the courts but is subject to judicial investigation and consideration. *State ex rel. Catron* v. *Sims*, 133 W. Va. 610, 57 S. E. 2d 465; *State ex rel. Adkins* v. *Sims*, 130 W. Va. 645, 46 S. E. 2d 81; *State ex rel. Cashman* v. *Sims*, 130 W. Va. 430, 43 S. E. 2d 805, 172 A. L. R. 1389.

In point 3 of the syllabus in the *Cashman* case this Court said: "A finding by the Legislature of the existence of a moral obligation of the State, based upon facts which give rise to a juristic condition, is subject to investigation and consideration by the courts; and the determination of the existence of such obligation is a

judicial, not a legislative, function." See also *State ex rel. Coole* v. *Sims*, 133 W. Va. 619, 58 S. E. 2d 784. In the *Cashman* case the opinion contains this language: "When, however, the declaration of the Legislature is based on facts which give rise to an existing juristic condition, the declaration is not conclusive. The matter here involved, being in its nature primarily juristic, the finding of the Legislature upon the facts disclosed by the opinions of the members of the State Court of Claims is subject to judicial inquiry and consideration. *Berry* v. *Fox*, 114 W. Va. 513, 172 S. E. 896. The facts in this case, upon which the legislative declaration of a moral obligation rests as distinguished from a declaration of fact which denotes a governmental policy and affords a basis for legislation, give rise to a juristic condition which calls for judicial determination. Here the legislative declaration is not merely factual but is juristic in its nature. The courts must decide whether a condition of that character, which arises from particular facts, creates a moral obligation against the State. The decision of that question involves the judicial process, and is a judicial, not a legislative, function."

In *Price* v. *Sims*, 134 W. Va. 173, 58 S. E. 2d 657, this Court said: "The action of the Legislature and of the court of claims in approving or rejecting claims presented to either involves the exercise of a legislative, not a judicial, function. In finding and declaring, by the enactment of a statute, that a moral obligation of the State, based upon facts which give rise to a juristic condition, exists, the Legislature performs a legislative function, but the determination of the validity of such obligation, which involves the constitutionality of the statute, is a judicial, not a legislative, function."

In *State ex rel. Adkins* v. *Sims*, 130 W. Va. 645, 46 S. E. 2d 81, point 2 of the syllabus is expressed in these words: "Whether an appropriation is for a public, or a private purpose, depends upon whether it is based upon a moral obligation of the State; whether such moral obli-

gation exists is a judicial question; and a legislative declaration, declaring that such moral obligation exists, while entitled to respect, is not binding on this Court." In the opinion in the *Adkins* case this Court also said that whether a legislative declaration of fact is to be accepted as generally binding on the courts, depends on whether that question is or is not judicial in character, that such question is judicial in character, and that the declaration of the Legislature, although entitled to respect, is in no wise conclusive or in any way binding on this Court. Point 2 of the syllabus in the *Adkins* case is quoted and approved in point 1 of the syllabus in *State ex rel. Catron* v. *Sims*, 133 W. Va. 610, 57 S. E. 2d 465, and the opinion in the *Catron* case contains this statement: "Although the factual findings of the Legislature in adopting the findings of the court of claims are entitled to great weight, the matters involved therein being in their nature primarily juristic, as defined in the *Cashman* case, the findings are subject to judicial review, and this Court must decide whether the facts portrayed by the instant record create a moral obligation against the State and in favor of relator."

Under the decisions cited in the preceding paragraphs of this opinion it is incumbent on this Court to determine in this proceeding whether the conduct of the mechanic, as the agent and employee of the State Road Commission, in the circumstances which then existed, constituted negligence which would be judicially recognized as such in an action for damages between private persons.

In discussing the subject of negligence the text in Section 24, Volume 1, Shearman and Redfield on Negligence, Revised Edition, Zipp, contains these statements:

"Foresight, not retrospect, is the standard of diligence. It is nearly always easy, after an accident has happened, to see how it could have been avoided. But negligence is not a matter to be judged after the occurrence. It is always a question of what reasonably prudent men under

the same circumstances would or should, in the exercise of reasonable care, have anticipated.

"Reasonable anticipation is that expectation created in the mind of the ordinarily prudent and competent person as the consequence of his reaction to any given set of circumstances. If such expectation carries recognition that the given set of circumstances is suggestive of danger, then failure to take appropriate safety measures constitutes negligence. On the contrary, there is no duty to guard when there is no danger reasonably to be apprehended.

"Negligence is gauged by the ability to anticipate. Precaution is a duty only so far as there is reason for apprehension."

Actionable negligence necessarily includes the element of reasonable anticipation that some injury might result from the act. *Koehler, Admr.* v. *Waukesha Milk Company*, 190 Wis. 52, 208 N. W. 901. In *Gerdes* v. *Booth and Flinn*, 300 Pa. 586, 150 Atl. 483, the court used this language: " * * * generally a person cannot be charged with negligence because he failed to anticipate unforeseen or unusual circumstances or occurrences." Failure to take precautionary measures to prevent an injury which if taken would have prevented the injury is not negligence if the injury could not reasonably have been anticipated and would not have happened if unusual circumstances had not occurred. *Dennis* v. *Odend'Hal-Monks Corporation*, 182 Va. 77, 28 S. E. 2d 4; *Virginia Iron Coal and Coke Company* v. *Hughes' Adm'r.*, 118 Va. 731, 88 S. E. 88. "Where a course of conduct is not prescribed by mandate of law, foreseeability of injury to one to whom duty is owed is of the very essence of negligence. If injurious consequences are not foreseen as a result of the conduct, then that conduct is not negligence." 13 M. J., Negligence, Section 22. See also *Cleveland* v. *Danville Traction and Power Company*, 179 Va. 256, 18 S. E. 2d 913. A person is not liable for damages

which result from an event which was not expected and could not have been anticipated by an ordinarily prudent person. *Consumers' Brewing Company* v. *Doyle's Adm'x.*, 102 Va. 399, 46 S. E. 390; *Fowlks* v. *Southern Railway Company*, 96 Va. 742, 32 S. E. 464; *Southern Railway Company* v. *Bell*, 4 Cir., 114 F. 2d 341. "If an occurrence is one that could not reasonably have been expected the defendant is not liable. Foreseeableness or reasonable anticipation of the consequences of an act is determinative of defendant's negligence." *Dennis* v. *Odend'Hal-Monks Corporation*, 182 Va. 77, 28 S. E. 2d 4. "Due care is a relative term and depends on time, place and other circumstances. It should be in proportion to the danger apparent and within reasonable anticipation." *Johnson, Adm'r.* v. *United Fuel Gas Company*, 112 W. Va. 578, 166 S. E. 118, 170 S. E. 429.

To warrant a finding that negligence is the proximate cause of an injury it must appear that the injury was the natural and probable consequence of the negligent act and that it ought to have been foreseen in the light of the attending circumstances. *Scheffer* v. *Washington City, Virginia Midland and Great Southern Railroad Company*, 105 U. S. 249, 26 L. Ed. 1070; *Milwaukee and St. Paul Railway Company* v. *Kellogg*, 94 U. S. 469, 24 L. Ed. 256; *Spence* v. *American Oil Company*, 171 Va. 62, 197 S. E. 468, 118 A. L. R. 1120; *Fowlks* v. *Southern Railway Company*, 96 Va. 742, 32 S. E. 464; *Connell's Ex'rs.* v. *Chesapeake and Ohio Railway Company*, 93 Va. 44, 24 S. E. 467, 32 L. R. A. 792. One requisite of proximate cause is the doing or the failure to do an act which a person of ordinary prudence could foresee might naturally or probably produce an injury, and the other requisite is that such act or omission did produce the injury. *Washington and Old Dominion Railway* v. *Weakley*, 140 Va. 796, 125 S. E. 672; *Virginia Iron Coal and Coke Company* v. *Hughes' Adm'r.*, 118 Va. 731, 88 S. E. 88. In *Donald* v. *Long Branch Coal Company*, 86 W. Va. 249, 103 S. E. 55, this Court held in point 1 of the syllabus that negligence to be actionable must be the proximate

cause of the injury complained of and must be such as might have been reasonably expected to produce an injury. See also *Anderson* v. *Baltimore and Ohio Railroad Company*, 74 W. Va. 17, 81 S. E. 579, 51 L. R. A., N. S., 888.

Although the mechanic testified that he does not know exactly how the fire originated, the only reasonable conclusion or inference to be deduced from the evidence is that the fire was started by his act in moving the creeper on which he was lying from beneath the truck on the concrete floor of the garage where gasoline from the leaking tank had accumulated. The contention of the petitioner is that the fire originated in that manner. Upon the assumption that the fire originated in that manner, the mechanic, as a reasonably prudent person, could not have foreseen or anticipated that by moving the creeper in an effort to extricate himself from beneath the truck a fire would occur which would ignite his clothes and parts of his body, the truck, the gasoline covered portion of the concrete floor, and the gasoline in the nearby container. Had he expected any such event he would not have jeopardized life or limb by placing himself in the position in which he was when the sudden fire occurred. The evidence does not establish any other act upon his part which could have caused the fire. According to his testimony he was not smoking at the time the fire occurred and he was not using any fire producing tool or apparatus while draining the tank before proceeding to remove it from the truck in order to repair it at the station provided for that purpose in the rear of the garage at a distance of approximately thirty feet from the point of the origin of the fire. Though one witness testified that the mechanic had a torch when he was near the truck before it was removed from the garage and another witness testified that he had an implement which resembled a torch when "he was working on" the truck after it had been driven from the garage, the testimony of the mechanic that he did not use a torch is con-

vincingly supported by the testimony of the maintenance foreman that the only torch in the garage was found by him at the location of the repair station after the fire had ceased. If the mechanic had been smoking or had used a torch or other flame producing tool or apparatus while engaged in draining gasoline from the tank in or near the area over which the leaking gasoline had spread, negligence upon his part would have been clearly shown. There is, however, no evidence which establishes any conduct of that sort upon the part of the mechanic.

The undisputed testimony of the mechanic is that he had repaired a leaking gasoline tank on the same truck or a similar truck in the garage some time before the fire; and the evidence does not show that the use of a creeper in connection with such repairs in similar circumstances had ever ignited gasoline, or that the use to which the creeper was applied was hazardous or apt to cause a fire, or that a creeper is an improper or dangerous appliance which, when devoted to such use, would likely ignite gasoline or other inflammable substances over which it would pass on a concrete floor. In the absence of any such facts, the conduct of the mechanic in using the creeper as he did under the then existing conditions did not constitute negligence which proximately caused the loss sustained by the petitioner.

The evidence shows that the wholly unexpected fire occurred suddenly, that it spread immediately to the clothing and the person of the mechanic, that as soon as he could extinguish the flames that had reached him, which he did quickly, he attempted, though unsuccessfully, to extinguish or check the fire in the garage by the use of a fire extinguisher. In the sudden emergency with which he was confronted his conduct in avoiding the imminent peril of serious injury to his person was that of an ordinarily prudent person in the same or similar circumstances. In so acting he was not guilty of negligence. "The care required by law of one in a sudden emergency is that of the average person under like cir-

cumstances." Point 6, syllabus, *Robertson* v. *Hobson,* 114 W. Va. 236, 171 S. E. 745. Similar statements of the rule just quoted appear in *Somerville* v. *Dellosa,* 133 W. Va. 435, 56 S. E. 2d 756; *Laphew* v. *Consolidated Bus Lines,* 133 W. Va. 291, 55 S. E. 2d 881; *Keatley* v. *Hanna Chevrolet Company,* 121 W. Va. 669, 6 S. E. 2d 1; *O'Dell* v. *Universal Credit Company,* 118 W. Va. 678, 191 S. E. 568; and *Oldfield* v. *Woodall,* 113 W. Va. 35, 166 S. E. 691. *Jones* v. *Hanbury,* 158 Va. 842, 164 S. E. 545. See also 38 Am. Jur., Negligence, Section 41.

The mechanic was not guilty of negligence in his unsuccessful efforts to extinguish or check the fire in the garage. He made immediate use of one of the few available fire extinguishers, and his failure to put out the fire or to prevent its progress by that means can not be charged to neglect or carelessness on his part. By the time that he had extricated himself from beneath the burning truck and extinguished the fire on his clothes and parts of his body the fire in the garage had rapidly reached such magnitude that it was impossible to extinguish it or to control its progress by any or all of the available fire fighting equipment which he might have used. When he realized that the fire had progressed beyond his power to control it he informed the petitioner of the presence of the fire and called upon him for assistance. The petitioner, who came immediately, was likewise powerless to check the flames and after quickly procuring from his nearby store a bag containing fifty pounds of lime he was unable to place it nearer than several feet from the burning gasoline in the five gallon container. At that time he realized that the fire in the garage was beyond control and he and the other persons then present abandoned their efforts to save the garage and at once turned to the work of removing articles of merchandise from the nearby building of the petitioner which, at that time or almost immediately afterwards, was also afire.

The inflammable character of the superstructure of

the garage and the limited apparatus to combat fire with which it was equipped were not the fault of the mechanic and did not constitute negligence upon the part of representatives, agents and employees of the State Road Commission. Though these features may properly be considered in determining whether the mechanic was guilty of negligence, they were in fact merely passive conditions which existed before and at the time of the fire. In the absence of any valid ordinance or statute which required the garage to be of fireproof construction, the commission was under no duty or obligation to operate or maintain its garage in a fireproof structure. As to the available fire protection, there was no system installed or maintained by the Town of Huttonsville, with a population of approximately 300 persons, by which a supply of water adequate to cope with a fire of major proportions could be obtained or utilized. In those circumstances the only kind of fire fighting equipment available or that could have been made available consisted of the apparatus with which the garage was equipped in sufficient number and amount to extinguish or check only an incipient or a small sized fire. Under those conditions there was no practical way in which the State Road Commission could provide equipment adequate to combat successfully a sudden, intensely hot, and rapidly expanding fire such as that which unexpectedly occurred in the garage on the morning of April 21, 1948. In the existing situation the commission was under no duty to install and maintain fire fighting equipment of a different type from that with which the garage was supplied or to furnish the same kind of equipment in larger units or in greater quantities. It is most unlikely that if the garage had been supplied with several times the number of fire extinguishers and buckets containing chemically treated sand then in the garage the spread of the fire to the building of the petitioner could have been prevented. To save that structure after the fire in the garage had passed beyond the control of the mechanic the services of a capable and adequately equipped fire fighting organiza-

tion were necessary; and fire protection of that kind was not available and could not have been made available by any possible action of representatives, agents and employees of the commission. If no duty exists there can be no negligence.

The recent case of *State ex rel. Catron* v. *Sims,* 133 W. Va. 610, 57 S. E. 2d 465, on which the petitioner strongly relies to sustain the declaration by the Legislature of the existence of a moral obligation in favor of the petitioner and the appropriation for its payment, is readily distinguishable from the case at bar. The fire considered in the *Catron* case was purposely started by agents and employees of the State Road Commission, on an open section of the right of way of a state highway, while they were engaged in removing trees and brush on the right of way in close proximity to land leased by the petitioner on which were located several thousand evergreen trees in process of cultivation. The fire was started and maintained within six feet of the growing trees. Communication of the fire to the trees of the petitioner was foreseeable and could have been reasonably anticipated by the employees who started the fire but they failed to take any precaution to prevent it from spreading to and destroying the trees on the land leased by the petitioner. In that case negligence upon the part of the employees of the commission which was the proximate cause of the destruction of the trees was clearly established and the moral obligation declared by the Legislature based on its finding of negligence was sustained by this Court. On the contrary the fire involved in the instant proceeding was not purposely started and, as previously pointed out, its origin was not foreseeable and could not have been reasonably anticipated by the mechanic employed by the commission. For that reason, his conduct in connection with the fire in the garage did not constitute negligence which proximately caused loss and damage to the property of the petitioner, and the holding in the *Catron* case does not apply to the materi-

ally different facts here involved or control the decision in the present proceeding.

As the acts and the omissions in connection with the origin and the spread of the fire, disclosed by the evidence, do not constitute negligence and would not be judicially recognized as such in an action for damages between private persons within the rule enunciated in point 4 of the syllabus in the *Cashman* case, the declaration by the Legislature of the existence of a moral obligation of the State in favor of the petitioner, based on its finding of negligence, is unwarranted and can not be recognized as valid; and, as no valid moral obligation exists in favor of the petitioner, the appropriation made by the Legislature for the payment of his claim is for a purely private purpose and can not be upheld. To render an appropriation of public funds for the payment of a claim of a person against the State an appropriation for a public purpose it must be based upon a valid moral obligation of the State. *State ex rel. Adkins* v. *Sims,* 130 W. Va. 645, 46 S. E. 2d 81. Though the Legislature has the power to make an appropriation to a private person for the discharge of a moral obligation of the State, it is without power to appropriate public revenue for a purely private purpose. *Woodall* v. *Darst,* 71 W. Va. 350, 77 S. E. 264, 80 S. E. 367, 44 L. R. A., N. S., 83, Ann. Cas. 1914B, 1278; *State ex rel. Cashman* v. *Sims,* 130 W. Va. 430, 43 S. E. 2d 805, 172 A. L. R. 1389; *State ex rel. Adkins* v. *Sims,* 130 W. Va. 645, 46 S. E. 2d 81. "An appropriation by the Legislature of public funds for a purely private purpose is beyond the scope of its legitimate powers of legislation and is, for that reason, null and void." Point 5, syllabus, *State ex rel. Cashman* v. *Sims,* 130 W. Va. 430, 43 S. E. 2d 805, 172 A. L. R. 1389. In the situation disclosed by the facts in this case, the Legislature was without power to declare the claim of the petitioner to be a moral obligation of the State or to make an appropriation of public funds for its payment. For that reason that part of Chapter 28, Acts of the Legislature, 1951, Regular Session, which declares

the claim of the petitioner to be a moral obligation of the State and directs the Auditor to issue a warrant for its payment, and that part of Chapter 8, Acts of the Legislature, 1951, Regular Session, which appropriates the sum of $21,080.71 for the payment of the claim, are unconstitutional, null and void.

The writ of mandamus prayed for in the petition is refused.

*Writ refused.*

RILEY, JUDGE, dissenting:

With deference I dissent from the decision of this Court in the above-styled case, for the reason that I am of opinion that the facts in this case bring it within the holding of this Court in point 2 of the syllabus of *State ex rel. Catron* v. *Sims*, 133 W. Va. 610, 57 S. E. 2d 465. This syllabus reads: "A moral obligation of the State in favor of a private person such as would ground a valid appropriation of public funds exists where there is 'an obligation or a duty, legal or equitable, not imposed by statute but created by contract or resulting from wrongful conduct, which would be judicially recognized as legal or equitable in cases between private persons.' *State ex rel. Cashman* v. *Sims, Auditor*, 130 W. Va. 430, 442."

In the instant case the crew foreman of the State Road Commission drove a truck belonging to the road commission, the gasoline tank of which was leaking at the time, into the road commission's garage. The foreman placed the truck on the concrete floor of the garage about four feet away from the side of the garage nearest the building of relator, J. A. Cox. After placing the truck in that position, a mechanic, likewise an employee of the road commission, employed at the garage, went under the truck on a movable appliance known as a "creeper", which moved on four steel rollers. In preparing to repair the leak in the tank the mechanic drained five gallons of gasoline from the tank into a large open can, and then closed the drainage valve on the tank. The mechanic

then pushed the can from under the truck to a position between the rear fender of the truck and the nearest side of the garage. In the meantime the gasoline, which had leaked from the truck, had spread on the concrete floor of the garage over a circular space of eight or ten feet, and while the mechanic was on the creeper, moving it toward the rear of the truck for the purpose of withdrawing the can from beneath the truck and getting another container for use in draining the remaining gasoline from the tank, the gasoline on the concrete floor suddenly became ignited. The fire spread quickly, first to the clothing and parts of the body of the mechanic, and then to the truck, the gasoline in the nearby open container, and the wall adjacent to relator's building and the ceiling of the garage.

As there was no open fire in the garage at the time the gasoline became ignited, it seems that it was ignited by no other means than sparks engendered by the steel wheels on the concrete floor. This the road commission's mechanic should have reasonably anticipated. He, therefore, was guilty of negligence, which proximately caused the damage to and destruction of relator's property. Under the doctrine of *respondeat superior* and the holding of this Court in point 2 of the syllabus in the *Catron* case and similar cases, the State Road Commission would be liable in an action at law, were it not for the immunity of the State from suit under Section 35, Article VI, West Virginia Constitution, which reads: "The state of West Virginia shall never be made defendant in any court of law or equity, * * *."

This case, in my opinion, cannot be distinguished in principle from the *Catron* case. In the instant case the State Road Commission through its employee, the mechanic employed at the garage, by negligence started what was initially a hostile fire, which proximately resulted in damage to relator's property. In the *Catron* case the employees of the State Road Commission started what was initially a friendly fire on the right of way of

West Virginia-United States Route No. 60 in close proximity to Catron's property, upon which he was growing "Christmas" trees, which fire, though initially friendly, became through the negligence of the road commission's employees a hostile fire, resulting in the destruction of a large number of Catron's trees. On the basis of these facts this Court in the *Catron* case held that there was a moral obligation on the part of the State in Catron's favor, which would ground a valid appropriation of public funds.

For the foregoing reason I would grant the writ prayed for.