GARDEN, JUDGE:
On December 15, Í967, at approximately 5:00 p.m., the Silver Bridge, which spanned the Ohio River from Point Pleasant, West *111 Virginia, to a point on the Ohio shore a few miles north of Gallipolis, Ohio, collapsed, constituting one of the worst disasters, if not the worst, in the history of the State of West Virginia. At the time of collapse, there were 37 vehicles on the bridge, 29 vehicles in the westbound lane and the remaining 8 vehicles (six cars and two heavily laden gravel trucks) in the eastbound lane. Six vehicles were on the approach span and not affected by the collapse. Seven vehicles fell to the ground below the Ohio side span and the remaining vehicles, 24 in number, fell into the river. Of the 64 persons in the 31 vehicles that fell with the bridge, 46 died and 9 of the 18 survivors were injured.
As a result of this disaster, 56 claims for wrongful death, personal injury and property damage were filed in this Court, and two additional wrongful death claims were filed just prior to December 15, 1974, seeking recovery for the wrongful death of two persons whose bodies were never recovered from the Ohio River. At the initial stages of this litigation, it was stipulated that in Claim Nos. D-240 and D-268o, Margaret Mae Cantrell, Administratrix, and William Frederick White, Executor, were the legal representatives of two of the persons who died as a result of this tragedy. It was further stipulated that a determination of respondent’s liability in the above-mentioned claims would be dispositive of all other claims pending in this court as a result of the bridge collapse. It was further understood that only the issue of liability would be decided at this time, and that should it be determined that liability rested with respondent, additional testimony would be presented for the purpose of determining the proper amount of awards in each case.
On May 13, 1926, Congress authorized the construction of the Silver Bridge by the Gallia County Ohio River Bridge Company, an Ohio corporation, which had been formed prior thereto for the purpose of constructing a toll bridge across the Ohio River between Gallipolis, Ohio, and Point Pleasant, West Virginia. Initial plans for the bridge were submitted to the United States Engineers’ office in December of 1926. Ih j&áy of 1927; JrE. Grenier Company, as consulting engineer, prepared plans and specifications for the new bridge using parallel wire cables with two alternative methods of suspension, including eyebars. The contract for the construction of the bridge was awarded to the General Contracting Company of Pittsburgh, Pa., and American Bridge Company (a division of United States Steel Corporation) was awarded the sub-contract for the construction of the *112 superstructure. On July 1, 1927, American Bridge Company entered into a contract with General Contracting Company to build the superstructure using eyebars as the suspension method in lieu of parallel wire cables. The consulting engineer, J. E. Greiner Company, approved these plans in June of 1927. The bridge was completed in late June of 1928, and on June 29, 1928, the United States District Engineer reported that the conditions of the permit issued to the owner of the bridge, “had been fully complied with and the work completed in substantial accordance” with the approved plans. The total cost of the bridge was $898,096.44, of which $862,341.44 was attributed to construction. After construction, the bridge was operated as'a" toll bridge by its owiier until December 24, 1941, when it was sold to the State of West Virginia.
As constructed, the Silver Bridge was a heat-treated eyebar chain suspension bridge. It had a total of seven spans or sections, two 75' 3" spans (one on each end); two 75-foot spans (one on each side); two 380-foot spans (one on each side); and a center span of 700 feet. The two 380-foot spans and the 700-foot span were in suspension, and the eyebar chain also operated as a portion of the upper chord of the stiffening truss in the 700-foot and the two 380-foot spans. The bridge and approaches were supported by six concrete piers (number 1 through 6, west to east), and the chain was affixed to two rocker towers (located on piers 3 and 4) each of which towers was 130' 1014" high, extending approximately 95 feet above the deck or roadway. The roadway was 21 feet wide, and there was a 5' 6" wide sidewalk inside the stiffening truss on the upstream or north side of the bridge. Although the roadway, as originally designed, was to accommodate three lanes of traffic, it was ultimately constructed with only two lanes for movingAraffic,,., The chain suspension system was anchored on each side of theriver by almost identical anchorage chambers each of which was 44 feet across the front, 34 feet across the back and 200 feet long. The anchorages were filled with steel reinforced concrete and earth, each of which weighed approximately 10,000,000 pounds, and under each was embedded 405 steel reinforced concrete piles 15 feet long.
The chain suspension system contained a total of 148 eyebars, varying in length from 34' 8V2" to 65' 14", the lightest weighing 2,560 pounds and the heaviest 5,306 pounds. Eyebar 330 (the origin of the ultimate collapse) was 63' 11" in length and weighed 5,053 pounds. The head of the eyebar was 28 inches in diameter, 1 and 15/16 inches thick and 12 inches wide. It was connected to other eyebars *113 at what will later be referred to as joint C-13 by a pin which was 1114 inches in diameter, 13 inches in length and weighing in excess of 300 pounds.
As earlier mentioned, the bridge was constructed on six concrete piers. Piers 3, 4 and 5, as constructed, were erected in the river, resting on steel reinforced concrete caissons which in turn were resting on bedrock. Piers 1 and 6, so-called land piers and being tlie most westerly and easterly piers of the bridge, supported only the approaches and were completely independent of any support for the spans in suspension. Pier 2, on the Ohio side, was also constructed on land. For vehicular traffic, the roadway of the bridge had a vertical clearance of 16 feet, and the height of the roadway above the water at normal pool stage was in excess of 100 feet.
Two other events took place after the bridge was completed in 1928, both of which the claimants vigorously contended led to or contributed to the ultimate collapse of the bridge. In 1937, the Gallipolis Lock and Dam was completed some 14 miles down-stream from the Silver Bridge. This dam raised the elevation of the river 1814 feet above the normal pool stage at the Silver Bridge. Then again between 1949 and 1952, a floodwall was constructed on the West Virginia side of the Ohio River at Point Pleasant. It was so constructed that the base of the floodwall was 2614 vertical feet and 100 feet horizontally from, the normal pool stage and the edge of the river.
Respondent’s first concern immediately after the collapse was to rescue any survivors who might have been trapped in submerged vehicles. Thereafter, its attention was directed to the recovery of the bodies of the victims, and then to the removal from the water, those portions of the bridge which had collapsed in the river with the ultimate purpose of opening the channel for river traffic.
Prior to the collapse, the U. S. Corps of Engineers had contractors working upstream on one of their projects and within hours after the collapse, they were able to move very heavy barge-mounted cranes onto the site. These contractors obtained a crew of divers who came in and assisted in the salvage operation. The respondent assigned engineers on a round-the-clock basis to superintend the salvage operation and instituted a system of marking each structural member of the bridge as it was removed from the river so that it could later be identified during the re-assembly process, hereinafter described. This was a most *114 difficult procedure for many of the structural members were buried under concrete from the roadbed of the bridge and had to be cut before they could be removed from the river. Most of this material was initially deposited on the Ohio shoreline. The salvage operation was largely completed in March of 1968 but not fully completed until July of the same year. At the end, it was estimated that at least 80% of the metal members of the bridge had been recovered.
When the news of the collapse reached Washington, the Federal Highway Administration dispatched Charles F. Scheffey to Point Pleasant. Mr. Scheffey, who was then with the research division of the Bureau of Roads, arrived in Point Pleasant on the afternoon of December 16, 1967, and worked closely with local federal highway people and representatives of the respondent in the supervision of the salvage operation.
In the middle of the following week, and at the request of the Federal Highway Administration, the National Transportation Safety Board was directed to assume the investigation and determine the cause of the bridge collapse. The National Transportation Safety Board was relatively new at the time, having been in existence less than a year. It had been formed when the Federal Department of Transportation was created, but it is not a part of that department. It is an independent board consisting of five members appointed by the President with the specific mission to act as a watchdog on transportation safety. Prior to its creation, the only comparable group was an aircraft disaster investigating group within the Civil Aeronautics Board, but after its creation, the National Transportation Safety Board was given the responsibility of investigating all transportation-related disasters, including aircraft disasters.
The National Transportation Safety Board designated Admiral Louis M. Thayer, a member of the Board, to officially head the investigation. Three separate committees or working groups were appointed. There was a bridge design review and bridge history group, a witness interrogation group and finally, a structural analysis and test group, which was chaired by Charles F. Scheffey. In addition to its own technicians, the structural analysis and test group were supplemented by technical representatives from all parties in interest. Giahs e q he ritly, th^test groupNmcluÜed representatives from the State of West Virginia, the State of OHio, J. E. Greiner Co. of Baltimore, Maryland, the designers of the *115 bridge, and United States Steel Corporation, the parent corporation of American Bridge Company, the contractor for the erection of the superstructure. Also named were representatives of the consulting firm of Modjeski & Masters that had been retained by respondent to conduct an independent investigation into the cause of the collapse, and representatives of the consulting firm of Hardesty & Hanover that had also been retained by respondent to assist in making a determination concerning the future of the Silver Bridge’s twin bridge which spanned the Ohio River at St. Marys, West Virginia. The official working group was further supplemented at the meetings by consultants and people from the laboratories that conducted metallurgical tests on structural members from the bridge.
Returning again to the salvage operation, sometime during the third night following the collapse, eyebar 330 was recovered from the river. The people in charge of the salvage operation had been instructed to be on the lookout for any eyebar that appeared to be fractured. Upon being notified that an eyebar had been recovered with a fractured eye, Mr. Scheffey went to the Ohio shore where the eyebar had been taken and examined it. The mud was washed from the fracture site, and to preserve the fracture site, a coating of hair spray lacquer was applied. The outboard portion of the eye which had been fractured was not found at this time. In order to locate the outboard portion of the eye, dredging operations were conducted and the dredged material was sifted. In this manner, several weeks later, the missing portion of eyebar 330 was located.
Respondent soon after the collapse leased a large pastureland area south of Point Pleasant and on the east bank of the Ohio River. As earlier indicated, the salvaged material, after being marked, was initially deposited on the Ohio bank of the river, but after patterns of the bridge trusses were staked out on the pastureland, the recovered structural members were transported to the reconstruction site where the bridge was reconstructed with the north and south sides of the trusses and their suspension chains laid out on horizontal planes. Detailed inspection^ were'conducted at the reconstruction áite, and thereafter various structural members, including eyebar 330, were transported to various laboratories where extensive and detailed metallurgical tests were conducted. Critical tests were conducted on eyebar 330 by the National Bureau of Standards, and corroborative tests were performed by United States Steel Corporation and Battelle Memorial Institute of Columbus, Ohio.
*116 On December 16,1970, and after the submission of several drafts by the three working groups, the National Transportation Safety Board issued its report concerning the collapse of the Silver Bridge. This report was introduced into evidence in these claims in its entirety as Claimants’ Exhibit 7. On page 126 of the report under the caption VI. Cause, the following language was set forth:
“The Safety Board finds that the cause of the bridge collapse was the cleavage fracture in the lower limb of the eye of eyebar 330 at joint C13N of the north eyebar suspension chain in the Ohio side span. The fracture was caused by the development of a critical size flaw over the 40-year life of the structure as the result of the joint action of stress corrosion and corrosion fatigue.
Contributing causes are:
1. In 1927, when the bridge was designed, the phenomena of stress corrosion and corrosion fatigue were not known to occur in the classes of bridge material used under conditions of exposure normally encountered in rural areas.
2. The location of the flaw was inaccessible to visual inspection.
3. The flaw could not have been detected by any inspection method known in the state of the art today without disassembly of the eyebar joint.”
Prior to taking any testimony, counsel for claimants and the respondent entered a stipulation designating the issues. They were designated as follows:
1. (a) Negligence in original and/or revised design of the bridge as built in 1927.
(b) Negligence on the part of the State of West Virginia in 1941 in accepting the bridge based on inadequate design.
(c) Negligence on the part of the State of West Virginia in not reviewing the design of the bridge from 1941 to 1967.
2. Negligence in construction of the bridge and in the materials used in the bridge.
3. Failure on the part of the State of West Virginia to adequately inspect the bridge.
*117 4. Failure on the part of the State of West Virginia to adequately maintain the bridge.
5. Negligence on the part of the State of West Virginia in failing to warn the general public of the potential, discoverable or known dangers of the bridge and/or failing to close the bridge or take other safety precautions.
6. Failure on the part of the State of West Virginia to adequately consider the effect on the bridge of riverbed activities.
7. Negligence of the State of West Virginia in accepting and in maintaining the bridge in its condition in violation of the Bridge Act of 1906, as constituting a public nuisance.
8. Liability of the State of West Virginia in violation of an implied warranty or representation of fitness for use by the general public.
9. Whether or not the collapse of the Silver Bridge was an unavoidable accident.
10. Whether or not any of the acts or failures to act by the State of West Virginia proximately caused or contributed to the collapse of the Silver Bridge.
11. Whether the applicable West Virginia or applicable Ohio death statute applied to each claim.
This Court commenced taking testimony on July 15,1974, and on fourteen additional days thereafter, completing the same on April 22, 1975. During that period of time, a record consisting of 2,339 pages was compiled. Claimants introduced into evidence 50 exhibits, respondent introduced 29, and 51 additional exhibits were introduced on the joint motion of claimants and respondent.
We believe that the designated issues as set out above have been unduly fragmented, and that a proper resolution of these claims requires us to resolve the following three basic issues:
(1) Was the Silver Bridge negligently designed, and if so, was the State of West Virginia negligent in purchasing the bridge in 1941?
(2) Was the State of West Virginia negligent in failing to consider the effect on the bridge, if any, of the construction of the Gallipolis Dam in 1937, the construction of the Point Pleasant floodwall between 1949 and 1952, and the alleged striking of the
*118 (3) Was the State of West Virginia negligent in failing to properly maintain and inspect the Silver Bridge?
With the exception of Eugene Lloyd Gwinn, Edward L. Cundiff and Bill S. Hanshew, Jr., all of the remaining witnesses testified as experts in their respective fields. Eugene Lloyd Gwinn, a supervisory civil engineer with the U.S. Army Engineers in Huntington, was called as a witness by the claimants and through him, many of the documents in the possession of the U.S. Army Engineers were identified and later introduced into evidence. Edward L. Cundiff, a bridge inspector for respondent in District No. 1 during 1963, 1964 and 1965, testified concerning his inspections of the Silver Bridge during those years, the manner of making the inspections, the report form used to record the results of such inspections, and generally, what his inspections during those years revealed.
Bill S. Hanshew, Jr., the assistant district engineer in District No. 1 at the time of the collapse, testified as to the training and instructions given to bridge inspectors by respondent, the manual followed by bridge inspectors in conducting investigations, and the results of various inspections that he personally made. It should be noted that Mr. Hanshew was a 1958 civil engineering graduate of West Virginia University. Because the testimony of the expert witnesses will be referred to with frequency in the remainder of this opinion, we deem it appropriate to briefly relate their respective qualifications.
Dr. Istvan Stephen Tuba of Pittsburgh, Pennsylvania, testified ' on behalf of the claimants. Dr. Tuba received a technology degree in 1952 from an institute in his native country of Hungary. He thereafter obtained a degree from the Technical University of Budapest which is the equivalent of a Bachelor of Science degree in mechanical engineering in this country. He came to this country in 1956 and continued to further his education. In 1960, he received his Masters degree in mechanical engineering from Carnegie Institute of Technology in Pittsburgh, and in 1964, his Doctorate from the University of Pittsburgh. Currently he is the President of Basic Technology, a Pittsburgh based consulting firm. He has been a lecturer at various universities in this country and at technical society meetings all over the world. He is currently, on a part time basis, a professor of mechanical engineering at the University of Pittsburgh.
*119 Dr. Charles A. Schacht of Pittsburgh, Pennsylvania, also testified on behalf of the claimants. Dr. Schacht was graduated from Ohio State University in 1960 with a Bachelor’s degree in civil engineering. He continued his education at Carnegie Institute of Technology and Massachusetts Institute of Technology, and ultimately obtained his Masters and Doctorate in civil engineering from Carnegie Institute, the latter having been awarded in 1972. He was the Executive Vice President of Basic Technology, but in October of 1974, was employed by the United States Steel Corporation as its senior research engineer at the company’s research laboratories near Pittsburgh, Pennsylvania.
Abba G. Lichtenstein of Leonia, New Jersey, was the remaining expert witness called by the claimants. Mr. Lichtenstein was the top man in his graduating class at Ohio State University where he received a civil engineering degree in 1948. Following his graduation, he worked for various companies as a bridge engineer, including the designing of railroad bridges and highway bridges. In 1963, he formed his own company, A. G. Lichtenstein & Associates. His company employs some 30 individuals, and 90% of the company’s activities are bridge related. This includes bridge evaluation for cities, counties and states, the recommending of repairs for immediate maintenance, the design of replacements and the study of locations for new bridges. He has been engaged continuously since 1948 in civil structural engineering. Of all of the witnesses who testified in these proceedings, Mr. Lichtenstein undoubtedly was the most experienced in the design of bridges.
Respondent in its case called Joseph S. Jones as its first witness. Mr. Jones, presently State Highway Engineer-Construction, was graduated from North Carolina State University with a Bachelor of Science degree in civil engineering in 1948. He immediately upon his graduation went to work for the respondent, and with the exception of an eight-year period between 1954 and 1962, he has been with the respondent in one capacity or another. During his eight-year absence, he was the Assistant Chief Engineer of the West Virginia Public Service Commission for three years. The other five years were spent with the consulting engineering firm of Michael Baker Company, acting as its Assistant Project Engineer in its Charleston office. During that period, the Michael Baker Company had a consulting contract with the respondent for the design and details for roadways and bridges for a large portion of Interstate 64 between Huntington and Charleston, and as a result, Mr. Jones actively participated in the design of approximately 40 *120 bridges in West Virginia and approximately 10 in the State of Kentucky. During his many years with the Department of Highways, Mr. Jones has served as a junior bridge design engineer, a senior bridge design engineer, assistant chief engineer, chief engineer of operations (the position he held at the time of the collapse), state highway engineer, and his present position of state highway engineer-construction. During his years with respondent, he has actively designed or assisted in the design of some 120 bridges.
Chester F. Comstock of Camp Hill, Pennsylvania, next testified on behalf of respondent. Mr. Comstock received his civil engineering degree from Drexel University in 1953, and while he did take some graduate courses, he does not hold a Masters degree. After graduation in 1953, he joined the firm of Modjeski & Masters of Harrisburg, Pennsylvania, and has worked continuously for them with the exception of several years spent in the Army. The firm of Modjeski & Masters is engaged basically in bridge and highway design. Mr. Comstock indicated that he had no experience in design work but that his experience was limited to bridge inspecting. He has inspected during his years with the firm some 400 to 500 bridges, including suspension bridges, in all parts of the country.
Charles F. Scheffey, the Chairman of the Structural Analysis and Test Group of the National Transportation Safety Board, was the concluding expert witness called by respondent. Mr. Scheffey received a Bachelor of Science degree in civil engineering from Drexel University in 1943. He thereafter spent 3 years in the service, principally in Korea. Following his return to this country, he began graduate work at the University of California at Berkeley. He became a part-time and later a full-time lecturer in the area of structural analysis and design. He continued to teach at Berkeley for a period of 15 years. His principal teaching assignments were senior engineering courses in bridge analysis and design and graduate courses in bridge analysis. During this period he did consulting work and conducted research projects for the California Division of Highways. Some of his research projects for the Division of Highways included problems associated with long-span bridges, including at least one suspension bridge, the San Francisco-Oakland Bay Bridge, where he studied the most appropriate loadings for such a long-span suspension bridge. He received his Masters degree from the University of California in 1951. During 1957-1958 he studied toward his Doctorate at the *121 Technical University of Darmstadt, Germany, but lacking his dissertation, the Doctorate was never received. In 1964 he went to Washington, D.C. on a leave of absence for the purpose of organizing and launching a program of research for the Structures and Applied Mechanics Division of the Bureau of Public Roads. He was doing that work when he became involved in the collapse of the Silver Bridge.
In order to discuss the design of the eyebar suspension system of the Silver Bridge, a more detailed description of the same is necessary and in particular, at the precise point of failure. Two separate eyebars made up each link of the suspension chain on the north side of the bridge as well as in the suspension chain on the south side. Eyebar 330 was the upstream bar in the second panel west of Pier 3. It was 63' 11" in length and weighed 5,053 pounds. Next and adjacent to eyebar 330 and making up the second panel was eyebar 33. The diameter of the heads of these two eyebars was 28", and through the heads there were drilled holes, the holes being eliptical in shape (12" vertically and 11-1/2" horizontally). At each joint, and in particular, at joint C-13, a steel pin weighing about 300 pounds and being 11-1/2" in diameter was inserted through the holes of the eyebars. Actually, this pin passed through the heads of four eyebars. At joint C-13 it ran through the heads of eyebars 330 and 33 and the heads of the two eyebars making up the adjoining panel. In addition, and between the eyebars, the pin ran through holes in two hanger plates. These hanger plates were connected to the stiffening trusses which gave support to the main body of the bridge. Consequently, at each joint, the steel pin went through and pressure was exerted thereon by four eyebars and two hanger plates.
Through each of the pins, a 4" hole was drilled, through which a steel rod, 1-1/4" in diameter, was inserted. On each end of the rod, and consequently, on each side of the complete joint, a retaining cap held by a double lock nut was inserted. These retaining caps were 12-1/2" in diameter. The obvious purpose of these caps was to keep the elements from the interior of the joint and in particular, those areas within the joint where the pin went through the heads of the eyebars and the hanger plates. They also effectively obscured from vision any portion of the pin within the joint itself.
In order to determine whether the Silver Bridge was negligently designed, it must be first ascertained the nature of the legal duty owed by the designer to the bridge owner. We are of opinion that *122 the designers of the Silver Bridge, or of any bridge, are under a duty to exercise reasonable care in the preparation of the plans and specifications to the end that the bridge constructed pursuant thereto would be in a reasonably safe condition for travel. We liken the duty of a bridge designer to that of an architect, and we would refer to the language contained in 5 Am Jur 2d, Architects § 23, where the following is contained.
“.However, in the absence of any special agreement in that regard, an architect’s undertaking does not imply or guarantee a perfect plan or satisfactory result, and there is no assurance that miscalculations will not occur. Liability rests only on unskilfulness or negligence, and not upon mere errors of judgment, and the question of the architect’s negligence in the preparation of plans is one of fact and within the province of the jury.”
By implication the claimants contended that the mere use of eyebars in the suspension chain constituted an improper design, and they suggested that the fact that eyebars are no longer used in bridge construction constituted evidence of their impropriety. On the other hand, we believe the evidence clearly reflected that their current lack of use in bridge construction is due entirely to economic considerations and not to safety considerations.
Respondent’s witness Scheffey testified that currently some 17,000 heat-treated eyebars are being used as members in various bridges in this country, and that there were a substantial number of eyebar suspension bridges built between 1900 and 1930. Respondent’s witnesses Jones and Comstock testified that eyebars were used in the chain suspension system of several European bridges, were used in the Dresden Bridge over the Muskinghum River which was constructed in 1915, were used/in the Florianopolis Bridge which was built in Brazil in 1925, in the Sixth, Seventh and Ninth Street Bridges constructed in Pittsburgh between 1925 and 1928, and in the St. Marys Bridge at St. Marys, West Virginia, constructed in 1929. Testimony further established that eyebars, while not used in the suspension system, are today present in such large bridges as the Greater New Orleans and Huey Long Bridges in Louisiana, the Rip Van Winkle Bridge over the Hudson River, the Walt Whitman Bridge in Philadelphia, and the Bluewater Bridge at Port Huron, Michigan.
Mr. Lichtenstein was of the definite opinion that the Silver Bridge was improperly designed. His contention was bottomed on *123 the fact that the design of the Silver Bridge differed in various ways from the design of the Florianopolis Bridge located in Brazil. The Florianopolis Bridge had been constructed by United States Steel Corporation a year or two before the Silver Bridge, but it had been designed by Dr. David B. Steinman, who at that time was one of the world’s most respected bridge designers. The J. E. Greiner Company, as indicated before, originally designed the Silver Bridge with the use of cables in the suspension system. They also submitted two alternatives, one of which substituted eyebars in the suspension system instead of cables. The design was modified by United States Steel Corporation in various particulars, the most important of which was the use of heat-treated eyebars in the suspension system. Mr. Lichtenstein testified that the two side spans on the Florianopolis Bridge were not connected to the suspension chain, whereas they were so connected in the design of the Silver Bridge. He pointed out that this difference caused less vibration and less movement in the Florianopolis Bridge and that to him, as a bridge designer, it constituted an important difference. Secondly, he testified that Dr. Steinman reduced the working load on the Florianopolis Bridge to 46,500 pounds per square inch (p.s.i.), whereas the Silver Bridge’s working load or stress was designed at 50,000 p.s.i. Thirdly, Mr. Lichtenstein testified that Dr. Steinman thickened the eyebar heads on the Florianopolis Bridge 1/16th of an inch on each side, or a total of l/8th of an inch, thus increasing their strength. Most importantly, Mr. Lichtenstein was of the opinion that the use of four eyebars in each panel as used in the Florianopolis Bridge instead of the two eyebars in each panel as used in the Silver Bridge, greatly increased the safety of the Florianopolis Bridge. He was of the opinion that if one bar broke on the Florianopolis Bridge, the whole joint would shift, and that while the bridge would tilt, traffic would have sufficient time to reach safety, whereas in the Silver Bridge with one of only two eyebars breaking, an immediate collapse occurred. His testimony in respect to this was sharply contradicted by witnesses Jones and Scheffey, they being of the opinion that a fracture of one of four eyebars in the Florianopolis Bridge would result in an immediate collapse.
Considerable testimony was introduced relating to factor of safety. In order to understand this term, it is necessary to understand the terms working stress and yield stress. Working stress is a figure adopted by a designer, and it represents the amount of stress on a bridge member when it is under its heaviest *124 loaded condition. Yield stress is a much higher figure and represents the amount of stress necessary to cause bridge members to yield or give to a point where they will not return to their original shape or position when the stress is released. The factor of safety is determined by dividing the yield stress by the working stress. Needless to say, the higher the factor of safety, the better.
Mr. Lichtenstein pointed out that the Greiner Company in its original design of the Silver Bridge called for a yield stress of 140,000 p.s.i. and a working stress of 80,000 p.s.i., or a factor of safety of 1.75. He indicated that this was a reasonable design but that in his opinion a factor of safety should always exceed 1.75. On the other hand, after United States Steel Corporation re-designed the bridge using eyebars, the design called for a yield stress of 75,000 p.s.i. and a working stress of 50,000 p.s.i., which resulted in a factor of safety of 1.5, which he felt was improper design.
Mr. Lichtenstein did admit on cross-examination that after the bridge collapsed, tests were run on the recovered eyebar, and the average yield stress was 81,000 p.s.i., and he further admitted that this yield stress thus produced a 1.62 factor of safety. Mr. Jones testified that according to his calculations a factor of safety of 1.77 at eyebar 330 existed at the time of collapse. He was of the further opinion that there is no magic in a 1.75 safety factor, and that it is simply a judgement factor used by a designer in commencing the design of a bridge structure. Mr. Scheffey was of the opinion that the factor of safety in the Silver Bridge had nothing to do with its collapse. We note with interest Mr. Jones’ testimony that it had been established through calculations that the stress on eyebar 330 at the time of the collapse was 42,500 p.s.i., or less than the working stress of 50,000 p.s.i. assigned to it by the designer. We must, therefore, conclude that the factor of safety, be it 1.5 or 1.75 or more, had nothing to do with the collapse of the Silver Bridge.
In discussing the design of the Silver Bridge, the National Transportation Safety Board used the following language on page 15 of its report adopted December 16, 1970:
“The computation performed by the Bridge Design Review and History Group (Reference 3 and Reference 5, Exhibit No. 3-E) indicated that the original design had been executed in accordance with normal engineering practice in use at the time of the original design, and that it was without mistakes or significant errors in the original stress computations, although *125 there was a minor error in the computed dead load stress in member L13-L15 of the Ohio side span and corresponding members of the center span and West Virginia side span. That group also established the fact that the stresses in critical members of the eyebar chain and trusses produced by the loading on the structure at the time of collapse were well below the specified maximum stresses provided for in the original design. Computations were carried out by the American Bridge Division of U.S. Steel using a digital computer, and were independently checked by the firm of Modjeski and Masters.” (Emphasis added.)
After the collapse it was widely reported that the collapse was due to the bridge being overloaded and due to the fact that the useful life of the bridge had expired. The expert testimony clearly established that neither of these reports was true. As part of the investigation and by acquiring copies of bills of lading reflecting the weight of the loads carried by the trucks, the exact amount of the live load on the bridge at the time of collapse was determined to be 486,000 pounds. Live load is the weight superimposed on a bridge by vehicles as contrasted with dead load which represents the weight of the bridge itself. Mr. Jones testified that the live load of 486,000 pounds was actually only 40% of the designed live load. Also the useful life of the bridge had not expired at the time of collapse, Mr. Scheffey being of opinion that only one-sixth of the useful life of the bridge had expired on the date of collapse.
We conclude on the basis of all of the foregoing that the design of the Silver Bridge was prepared in accordance with good engineering practice as it existed in 1926, and that the respondent was not negligent in purchasing the bridge, so designed, in 1941.
Claimants through their witnesses, Dr. Tuba and Dr- Schacht attempted to predicate liability qfn respondent as a result of the construction of the Gallipolis Dam in 1937 and the construction of the floodwall at Point Pleasant, West Virginia, between 1949 and 1952. It was their position that these activities caused additional waters to be cast upon the piers and on the Ohio shore causing a weakening of the bridge structure and anchorages, and that no steps were taken by respondent to rectify the situation. They also contended that the bridge piers were damaged when they were struck by run-away barges in April of 1966, and that no steps were taken to remedy that damage.
*126 Dr. Tuba testified that whenever water level is increased, the moisture content in the surrounding area is also increased and that this has a weakening effect on the basic strength and • basic behavior of the soil. He stated that this will tend to soften the soil and that there can be a sinking of any structures on the soil. He was of further opinion that because the soil was softened, it could cause distortion patterns to be transmitted to the bridge structure itself in terms of additional stresses and strains which would in the end effect the weakest link in the bridge. Dr. Schacht was of the opinion that the raising of the water level possibly caused a scouring effect on the Ohio shore resulting from water flowing into the pier areas on the Ohio shore; that it would change the permeability of the soil, or how it accepted water, and thus reduce the strength characteristics of the same.
It developed during the testimony of Dr. Tuba and Dr. Schacht that both of these gentlemen were basing their testimony on 36 source references connected directly or indirectly with the collapse of the Silver Bridge, these references having been furnished them by counsel for the claimants. It should be added that in addition to these source references, their testimony was, of course, also based on their training and experience in the fields of civil and mechanical engineering. Counsel for the claimants attempted to elicit their opinions through hypothetical questions, all of which were objected to vigorously by counsel for the respondent. These objections were all based on the fact that the hypothetical questions did not contain all of the material facts and, in addition, included facts not in evidence or facts unsupported by the evidence. At the conclusion of both'Dr. Tuba’s and Dr. Schacht’s testimony, counsel for respondent moved to strike their respective testimony, and thereafter supported the motions with persuasive briefs. This Court, when the motions were orally presented, took the motions under advisement and indicated that rulings would be made after the Court had an opportunity to read the transcript of their testimony.
Having reviewed their testimony, it is apparent that Dr. Tuba and Dr. Schacht had no personal knowledge of the design of the Silver Bridge, the construction of the Silver Bridge, the supporting structures of the Silver Bridge, the materials used in its construction, the soils upon which the supporting structures of the bridge rested, the details of the collapse of the Silver Bridge, and the methods, accuracy or completeness of the investigation and the results of the investigation conducted by the National *127 Transportation Safety Board. Neither of these witnesses had ever visited the site of the collapse, nor had they had an opportunity to inspect any of the structural members of the collapsed bridge. Although Dr. Tuba was testifying as to the effect of the construction of the Gallipolis Dam on the Silver Bridge, he was of the opinion that it was constructed in 1933, although, in fact, it was completed in 1937. He did not know the year in which the Point Pleasant floodwall was constructed. He did not know the number of piers supporting the bridge, testifying that there were five, when, in fact, there were six. He testified that prior to the construction of the dam, there were two piers in the water and that after the construction, there were three, or maybe four, piers in the water, when, in fact, the record clearly reflects that before and after the dam was constructed, there were three piers in the river and three piers on dry land. Dr. Tuba was of the opinion that the run-away barges striking the piers of the Silver Bridge contributed to its lack of structural integrity. He formed the opinion that the piers had been so struck from one of the source materials furnished him which set forth a Coast Guard report of run-away barges striking bridge piers at Point Pleasant, West Virginia. He was unaware of the existence of the railroad bridge immediately north of the Silver Bridge whose piers could have been struck. He was unable to state how many barges struck what piers, the weight of the barges and other facts which in the opinion of this Court would be necessary to form an opinion as to whether the structural integrity of the Silver Bridge had been damaged. As a matter of fact, respondent’s witness, Mr. Jones, who at the time of the alleged barge incident, was in a position with the Department of Highways where he would have been advised of such an incident, testified that he never in his official capacity received any notice of such incident.
The above are simply a few illustrations which in this Court’s opinion militates against our giving much weight to their testimony as experts, and we conclude that the claimants have failed to establish by a preponderance of the evidence that the construction of the Gallipolis Dam, the construction of the Point Pleasant floodwall, or the run-away barge incident contributed in any way to the ultimate collapse of the Silver Bridge.
The most serious issue and the one most difficult for this Court to resolve involves the adequacy of the maintenance and inspection of the Silver Bridge by respondent. In respect to the maintenance, there was evidence that, at least, in January of 1963, when the *128 witness, Edward L. Cundiff, inspected the bridge, he noted on his report that the bridge was rusted and in need of paint. The records of respondent as to repairs were poorly documented, but there was testimony that all recommended repairs during the years were made with the exception of some pier concrete patching work. In this respect, witness Jones stated that in his opinion, the minor deterioration in the piers had no effect on the eyebars in the bridge structure. There was some testimony to the effect that there was corrosion and rusting in secondary members, but it was agreed that such corrosion and rusting in secondary members had absolutely no effect on the structural integrity of the bridge itself nor in the structural integrity of the eyebars.
Extensive corrosion studies of all recovered structural members of the bridge were conducted by the firm of Modjeski & Masters, and in respect to Eyebar 330, it was determined that the loss of section due to corrosion was less than 5%, and witness Scheffey testified that any loss of section below 5% was insignificant. Witness Jones was of the opinion that the loss of section in Eyebar 330 was no greater than 1%. It should be pointed out that loss of section is a measure of the present load-carrying capability of a member as compared to its original load-carrying capacity.
In respect to the painting of the Silver Bridge, an inspection of Eyebar 330 after the collapse revealed an adequate coat of paint, at least, on the outboard side. The evidence reflected that the Silver Bridge had not been painted prior to its collapse since 1963, but in the opinion of witness Jones, the failure to paint between 1963 and December of 1967, did not cause or contribute to the fracture in Eyebar 330 which led to the collapse of the bridge.
During the hearings, the question Was frequently asked as to why respondent ultimately tore down the Silver Bridge’s sister bridge located in St. Marys, West Virginia. Immediately after the collapse of the Silver Bridge, respondent closed the St. Marys Bridge until a determination could be made as to the cause of the collapse of the Silver Bridge. As indicated earlier, the firm of Hardesty & Hanover was employed by respondent to make an extensive investigation as to the integrity of the St. Marys Bridge. Witness Scheffey testified that the examination was made with the best equipment which was then available, but that no defects were found in the St. Marys Bridge. He further indicated that they then took the same equipment and tested eyebars from the Silver Bridge, but were also again unable to detect any cracks which they *129 knew were present and were critical, and, consequently, they concluded that the examination of the St. Marys Bridge did not establish one way or the other whether the structure was safe. They were aware of the fact that in the St. Marys Bridge, the eyebars, because of the identity of design, were susceptible to stress-corrosion and, consequently, respondent upon the recommendation of the National Transportation Safety Board permanently closed the bridge and ultimately dismantled it.
In the area of inspection, this Court is highly critical of the procedure, or lack thereof, followed by respondent from its acquisition of the bridge in 1941 to the date of its collapse in December of 1967. The respondent maintained that during the period of its ownership its records reflected official inspections on at least 15 occasions, but yet, only 3 record cards reflecting inspections in 1959, 1963 and 1964 were introduced as exhibits. It appeared that these inspections were conducted on a rather hit and miss procedure and were not conducted generally by personnel with any specialized training in the art of bridge inspecting. For example, on January 11, 1963, witness Cundiff, who prior to his employment by respondent was a welder, inspected the Silver Bridge with C. W. Morris, who Cundiff described as being a blacktop inspector and who only accompanied him on this inspection as a safety factor. The evidence further revealed that when these inspections were made, they were only cursory in nature in respect to many areas of the bridge. This was particularly true in respect to the inspection of the superstructure in spite of the fact that the inspectors were following the instructions of a 1945 Maintenance Manual which read in part as follows:
“The corrosion of the top cords of high trusses is not visible from the roadway, but its inspection should not be slighted due to its inaccessability.”
In spite of the instructions contained in the manual, not one of respondent’s witnesses testified that on any occasion was the superstructure inspected by physically climbing the same. As far as inspecting the eyebars, including the retainer caps which concealed the junctions of the eyebars and hanger plates, respondent contented itself by inspecting the same through the use of binoculars. This visual inspection through binoculars would take place either by standing on the shore lines or by leaning out over the railing along the sidewalk on the north side of the bridge. Respondent’s witnesses indicated that on these occasions, they *130 would be looking for the presence of rust stain running from the bottom of the retainer caps, and that if this rust stain was not observed, they would conclude that no corrosion was taking place within the eyebars or on the pin running through them.
Contrast that procedure with the procedure followed by the firm of Modjeski & Masters as testified to by witness Comstock. Mr. Comstock testified that prior to 1967, his firm was employed by many bridge authorities and railroad companies for the purpose of making bridge inspections. He indicated that when his company was employed to inspect a bridge initially, a team of men whould be dispatched not only for the purpose of making an in-depth inspection, but also for the purpose of making a rating analysis, and that after these initial inspections were made, less formal inspections would be made on an annual basis, and that ordinarily an in-depth inspection would be made every three years. He testified that in conducting their inspections, the inspecting personnel would always climb every part of a bridge superstructure and while they would not remove all of the retaining caps on bridges similar to the Silver Bridge, they would remove some on a spot-check basis in order to determine the existence of any corrosion on the areas of the eyebars and pins that could be visualized.
We feel that the inspection procedures followed by respondent prior to December of 1967, fell alarmingly short of good inspecting procedure.
On the other hand, we believe that the testimony overwhelmingly established that the collapse of the Silver Bridge resulted from the phenomenon of stress-corrosion which occurred in the inside of the eye in Eyebar 330 at Joint 13. Mr. Lichtenstein testified that the collapse was due to a combination of two elements, that of extremely high stresses and some corrosion. Mr. Jones testified that stress-corrosion was a combination of highly localized unit stress with a mildly corrosive environment over a long period of time resulting in the development of small cracks. Mr.' Scheffey was of the opinion that the phenomenon should be defined as stress-corrosion cracking, and he further defined it as a cracking of a metal portion of a structure or machine across an area of tensile stress by the combined aetion of a corrosive agent and that sustained tensile stress. He further testified that in his. opinion there would have been no failure nor collapse of the Silver Bridge, absent the phenomenon known as stress-corrosion cracking.
*131 It was also definitely established by the evidence that the phonemenon of stress-corrosion or stress-corrosion cracking was either unknown in 1967 or was unknown in moderate tensile strength steels used in bridge structures. Mr. Lichtenstein stated that prior to the collapse of the Silver Bridge in 1967, he was unaware of any instance in which stress-corrosion had been found to be the cause of a fracture in an eyebar. Mr. Jones testified that prior to the collapse of the Silver Bridge, he was not familiar with stress-corrosion nor had he ever had any experience in stress-corrosion and he, like Mr. Lichtenstein, had never heard of a bridge collapsing as a result of stress-corrosion. Mr. Comstock, an experienced civil engineer and bridge inspector, stated that he was unaware of the term stress-corrosion until after the collapse of the Silver Bridge. Mr. Scheffey, on the other hand, testified that while he had not studied the phenomenon in engineering school, he had later become familiar with it and had lectured about it at the University of California, but he indicated that he had never, prior to the collapse of the Silver Bridge, experienced the phenomenon in moderate tensile strength steels used in bridge structures, and he was of the opinion that the best bridge designers in the engineering profession in 1967 would not have known that moderate tensile strength steels were susceptible to stress-corrosion cracking.
In addition to the apparent lack of knowledge of this phenomenon, the evidence vividly demonstrated that even if knowledge of this phenomenon did exist prior to the collapse of the Silver Bridge, its presence inside of the eye of Eyebar 330 could not have been detected through the most careful and sophisticated inspection by reason of its location within the eye which was tightly compressed against the steel pin. Mr. Lichtenstein testified that the only way the pin and the inside of the eye of Eyebar 330 could have been inspected would have been by taking the pin out of the joint, and that, of course, would cause a collapse. He did indicate that a system could have been constructed with cables to support the bridge on-a temporary basis while such an inspection could take place, but that the cost of performing this operation would be between $2,000,000.00 and $2,500,000.00. Mr. Jones agreed that it would have been impossible to detect the flaw through inspection, and even if the inside of the eye of the eyebar could have been visualized, the minute crack could not have been detected except with microscopic instruments. Mr. Comstock and Mr. Scheffey as well as the report of the National Transportation *132 Safety Board agreed that the location of the flaw was inaccessible to visual inspection.
While this Court is of the opinion that the respondent was guilty of negligence in the inspection procedure which it followed through the years, this negligence to be actionable, must have been the proximate cause of the collapse of the Silver Bridge, and to constitute the proximate cause, the stress-corrosion or stress-corrosion cracking within the eye of Eyebar 330 must have been forseeable. State ex rel. Cox v. Sims, 138 W.Va. 482, 77 S.E. 2d 151 (1953); Puffer v. Hub Cigar Store, 140 W.Va. 327, 84 S.E. 2d 145 (1954); Hartley v. Crede, 140 W.Va. 133, 82 S.E. 2d 672 (1954) and McCoy v. Cohen, 149 W.Va. 197, 140 S.E. 2d 427 (1965).
In Cox the Supreme Court of Appeals reversed an award of the Court of Claims arising out of a claim against the State Road Commission. The claim was the result of a fire caused by sparks from the defendant’s employee’s creeper while the employee was repairing the leaking gas tank of a truck. The Court, in refusing to issue a writ of mandamus against the Auditor compelling him to issue the warrant, addressed itself to the issue of proximate cause and foreseeability as an element of proximate cause, and stated as follows at page 496 of the West Virginia Reports, the following:
“Actionable negligence necessarily includes the element of reasonable anticipation that some injury might result from the act. Koehler, Admr. v. Waukesha Milk Company, 190 Wis. 52, 208 N.W. 901. In Gerdes v. Booth and Flinn, 300 Pa. 586, 150 Atl. 483, the court used this language: * * * B%generally a person cannot be charged with negligence because he failed to anticipate unforeseen or unusual circumstances or occurrences.’ Failure to take precautionary mea,s<w<4s to prevent an injury which if taken would halve presented the injury is not negligence if the injury could not reasonably have been anticipated and would not have happened if unusual circumstances had not occurred. Dennis v. Odend’Hal-Monks Corporation, 182 Va. 77, 28 S.E. 2d 4; Virginia Iron Coal and Coke Company v. Hughes’ Adm’r., 118 Va. 731, 88 S.E. 88. ‘Where a course of conduct is not prescribed by mandate of law, foreseeability of injury to one to whom duty is owed is of the very essence of negligence. If injurious consequences are not foreseen as a result of the conduct, then that conduct is not negligence.’ 13 M.J., Negligence, Section 22. See also Cleveland v. Danville Traction and Power Company, 179 Va. 256, 18 S.E. *133 2d 913. A person is not liable for damages which result from an event which was not expected and could not have been anticipated by an ordinarily prudent person. Consumers’ Brewing Company v. Doyle’s Adm’x., 102 Va. 399, 46 S.E. 390; Fowlks v. Southern Railway Company, 96 Va. 742, 32 S.E. 464; Southern Railway Company v. Bell, 4 Cir., 114 F. 2d 341. * * *
“* * * One requisite of proximate cause is the doing or the failure to do an act which a person of ordinary prudence could foresee might naturally or probably produce an injury, and the other requisite is that such act or omissiomdid produce the injury. Washington and Old Dominion Railway v. Weakley, 140 Va. 796, 125 S.E. 672; Virginia Iron Coal and Coke Company v. Hughes’ Adm’r., 118 Va. 731, 88 S.E. 88. In Donald v. Long Branch Coal Company, 86 W.Va. 249, 103 S.E. 55, this Court held in point 1 of the syllabus that negligence to be actionable must be the proximate cause of the injury complained of and must be such as might have been reasonably expected to produce an injury. See also Anderson v. Baltimore and Ohio Railroad Company, 74 W.Va. 17, 81 S.E. 579, 51 L. R. A., N. S., 888.”
Although the facts in Puffer bear no resemblance to the present factual situation, we feel the law as expressed in that decision is fully applicable here. In Puffer, the plaintiff had entered the defendant’s eating establishment in Charleston and while standing at the counter awaiting his food order, he was assaulted and injured by an intoxicated third party. The Court in reversing a lower Court judgment in favor of the plaintiff found that the defendant could not have reasonably anticipated or foreseen that the intoxicated third party would molest or injure the plaintiff, and the Court in discussing foreseeability used the following language appearing at page 336 of the West Virginia Reports:
“* * * A person is not liable for damages which result from an event which was not expected and could not have been anticipated by an ordinarily prudent person. Barbee v. Amory, 106 W.Va. 507, 146 S.E. 59; Consumers’ Brewing Company v. Doyle’s Adm’x., 102 Va. 399, 46 S.E. 390; Fowlks v. Southern Railway Company, 96 Va. 742, 32 S.E. 464; Southern Railway Company v. Bell, 4 Cir., 114 F. 2d 341. ‘If an occurrence is one that could not reasonably have been expected the defendant is not liable. Foreseeableness or reasonable anticipation of the consequences of an act is determinative of defendant’s *134 negligence.’ Dennis v. Odend’Hal-Monks Corporation, 182 Va. 77, 28 S.E. 2d 4. * * *”
We could cite a legion of cases expressing the identical principles of negligence law, but to us, string-citing additional authority would serve no useful purpose. We are of the firm opinion that the collapse of the Silver Bridge on the evening of December 15, 1967, could not have been anticipated or foreseen by the respondent in the exercise of reasonable care. The ultimate collapse was caused by a fracture of Eyebar 330 resulting from a phenomenon unknown to bridge engineers when the Silver Bridge was constructed in 1926 and unknown to bridge engineers on the date of its collapse.
The statute which created this Court authorized us to make awards in claims that the State of West Virginia in equity and good conscience should discharge and pay. If that was our only guideline, this Court, possessing the normal attributes of sympathy and compassion, would not hesitate to make awards. However, we have always interpreted this grant of jurisdiction to include the necessity of finding legal liability upon the State, before the test of equity and good conscience can be applied. We believe that in deciding claims, we must be bound by sound legal principles, and being of opinion that sound legal principles do not authorize recoveries, we hereby deny the claims arising out of the collapse of the Silver Bridge.
The opinion expressed herein renders moot the issue of the statute of limitations pending in the more recently instituted claims of George Byus, Administrator of the Estate of Catherine Byus, deceased, and Helen Foster, Administratrix of the Estate of May Maxine Jarrell a.k.a. May Maxine Turner, deceased v. Department of Highways, Claim Numbers D-891 and D-892.
Judge H. Lakin Ducker, who is no longer a member of this Court, fully participated in the hearing and this decision.
Claims disallowed.